**Rosalind FOGEL and Gerald Fogel, Plaintiffs-Appellants,**

v.

**George A. CHESTNUTT, Jr., et al., Defendants-Appellees.**

**No. 39, Docket 74–2582.**

United States Court of Appeals, Second Circuit.

Argued Sept. 22, 1975.

Decided Dec. 30, 1975.

---

Abraham L. Pomerantz, New York City (Richard M. Meyer, William E. Haudek, Daniel W. Krasner, and Pomerantz, Levy, Haudek & Block, New York City, of counsel), for plaintiffs-appellants.

Clendon H. Lee, New York City (Rogers, Hoge & Hills, New York City, of counsel), for defendants-appellees (other than American Investors Fund, Inc. Nominal Defendant).

Dewey, Ballantine, Bushby, Palmer & Wood, New York City (Edward N. Sherry, Judson A. Parsons, Jr., and Martin J. Schwartz, New York City), for Lord, Abbett & Co., as amicus curiae.

Before FRIENDLY, HAYS and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

More than four years after the First Circuit decided *Moses v. Burgin,* 445 F.2d 369 (1971), reversing 316 F.Supp. 31 (D.Mass. 1970), concerning the duty of the managers of a mutual fund to recapture brokerage commissions for the benefit of the fund, this court is confronted with the problem for the first time. In reviewing Judge Wyatt's dismissal on the merits of a recapture action in the District Court for the Southern District of New York, 383 F.Supp. 914 (1974), we must determine whether we agree with the First Circuit's decision and, if so, whether it applies to the somewhat different facts here at issue. With some qualifications our answers to both questions are in the affirmative. We therefore reverse and remand for the determination of damages.

### I. *The Root of the Problem.*

The present is one of what we understand to be a large number of derivative stockholders actions brought on behalf of mutual funds against investment advisers, distributors, and directors of both,[1] primarily in consequence of remarks in the SEC's Report on the Public Policy Implications of Investment Company Growth (PPI) 16,172–73 (1966), House Report No. 2337, 89th Cong.2d Sess.

The basic factual situation giving rise to the recapture problem is well described in Judge Wyatt's opinion, 383 F.Supp. at 916–18, in the opinion of Judge Wyzanski, 316 F.Supp. 31 (D.Mass.1970), and the reversing opinion of the First Circuit in *Moses v. Burgin, supra* in PPI, and in countless law review notes and articles both before and after *Moses.*[2] Accordingly we shall endeavor to be brief in our statement of the problem and will assume familiarity with the typical structure of the externally managed open-end mutual fund, a mere shell whose investment and management functions are

1. A 1971 article stated there had been fifty. Butowsky, Fiduciary Standards of Conduct Revisited—*Moses v. Burgin* and *Rosenfeld v. Black,* 17 New York Law Forum 735, 736 (1971), see also Comment, Mutual Funds and Independent Directors: Can Moses Lead to Better Business Judgment, 1972 Duke Law Journal, 429, 430 n. 8. Some such suits have been settled, *e. g., Weiss v. Chalker,* 55 F.R.D. 168 (S.D.N.Y.1972), 59 F.R.D. 533 (S.D.N.Y. 1973). Another action has recently been dismissed on the merits, although on grounds differing, at least in considerable part, from those adopted by the district court in the instant case. *Tannenbaum v. Zeller,* CCH Federal Se-

curities Law Reports ¶ 95,257 (Carter, D. J., 1975).

2. In addition to the articles cited in n. 1, see The Use of Brokerage Commissions to Promote Mutual Fund Sales, 68 Colum.L.Rev. 334 (1968); Conflict of Interest in the Allocation of Mutual Fund Brokerage Business, 80 Yale L.J. 372 (1970); Miller and Carlson, Recapture of Brokerage Commissions by Mutual Funds, 46 N.Y.U.L.Rev. 35 (1971); Fiduciary Obligations of Mutual Fund Managers in Portfolio Transactions, 22 Syracuse L.Rev. 1107 (1971); Note, 60 Georgetown L.J. 1594 (1972); Note, 13 Wm. & Mary L.Rev. 530 (1971).

performed by an adviser and whose sales are handled either by the adviser (or the fund itself) in the case of no-load funds or by a distributor (which may or may not be identical with the adviser) in the case of load funds.

At the root of the recapture problem was the historic practice of the New York Stock Exchange (NYSE) and other exchanges of charging a fixed rate of commission on each share traded regardless of the size of the transaction (except for the odd-lot differential). Since the costs of executing an order do not vary in accordance with size, the large sales and purchases at the command of investment advisers of mutual funds were particularly attractive orders. At first fund managers allocated their brokerage business to reward brokers who had been helpful in selling the fund's shares, in furnishing advice, or in doing both;[3] orders allocated as rewards were known as "reciprocals." However, as the business grew, the practice of reciprocals resulted, especially for the large funds, in using too many brokers, some of whom were not the best qualified to execute the particular order placed with them. Hence there developed the practice of relying on a few executing brokers who were then instructed to "give-up" a portion of their commissions, sometimes as much as 75%, to another broker whom the fund manager wished to reward. On NYSE this was permitted only in favor of another member, but six of the seven regional exchanges permitted "give-ups" in favor of non-members as well, provided they were members of the National Association of Securities Dealers, Inc. (NASD).

There was an obvious tension between the give-up and those representations made by the investment company in its prospectuses which investors would be likely to understand as meaning that the amounts paid to the investment adviser constituted the fund's cost for management and investment advice and, in the case of "load" funds, that the amounts retained by the distributor constituted the cost of sales. In fact, the management-directed "give-ups" to non-executing brokers represented additional amounts that were being paid for advising, selling or both, and the true costs of these services were thus higher than the advisory fee or the sales load. To the extent that a management company restricted its own research because of what was being furnished by brokers who were rewarded with give-ups or that a distributor retained for itself a larger part of the sales load than would have been competitively feasible in the absence of give-ups, the stipulated management fees yielded greater profits than they otherwise would have. The practice entailed other evils unnecessary here to detail. Still, if there was no way for a fund to "recapture" the excess of the fixed and unvarying commissions over what the executing broker would willingly accept, something was to be said for using the excess to reward brokers who had served the fund in some fashion rather than simply overpaying the executing broker. The SEC put its finger on the problem as early as 1963 when it said in its Report of the Special Study of Securities Markets, House Doc. No. 95, 88th Cong. 1st Sess. p. 234:

The Special Study concludes and recommends:

1. The pattern of reciprocal business in the mutual fund industry is unique. The economies of the volume of securities transactions generated by the mass purchasing power of the funds for the most part are of minor benefit to the funds themselves. The primary beneficiaries are their investment advisers and their frequently related principal underwriters, who to a large extent use reciprocity to reward the sales efforts of fund retailers, thereby increasing their own rewards. The use by fund advisers of investment advice and research provided by brokerage firms in return for fund brokerage, without diminution of their investment advisory fees, is another indication of the manner in which they are the primary

---

3. Some brokers rendered other services, such as making the required daily computation of the fund's net asset value, see PPI at 104.

beneficiaries of reciprocal business. This unbalanced reciprocal structure is a direct outgrowth of a minimum commission rate structure which prohibits volume discounts and rebates. In the broad study of the commission rate structure recommended to the Commission in chapter VI–I, appropriate consideration should be given to the desirability and appropriate form of a volume discount from the viewpoint of mutual funds.

As developed by Mr. Justice Blackmun in *Gordon v. New York Stock Exchange, Inc.,* 422 U.S. 659, 690, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), 43 U.S.L.W. 4958, 4961–62, reform of the commission rate structure had a long gestation period. Meanwhile a few adviser-underwriters decided to recapture for their funds some of the spread between the fixed and unvarying commissions payable to executing brokers and the lesser amounts the latter were willing to accept on large orders. In a discussion of this development, at 172–73, PPI echoed the Special Study's criticisms of mutual fund reciprocal and give-up practices and continued in a passage meriting full quotation, pp. 172–73:

(a) *Use of brokerage commissions to benefit the funds*

(i) *Reducing advisory fees.*—As has been noted, subsidiaries of four adviser-underwriters that maintain their own retail sales forces—among them three of the largest, Investors Diversified Services, Inc., Waddell & Reed, Inc., and Channing Financial Corp., as well as the smaller Imperial Financial Services, Inc. —are now members of the Pacific Coast Stock Exchange. These subsidiaries execute orders for the funds on the Pacific Coast Stock Exchange. More important, however, they obtain a considerable amount of nonfund business from broker-dealers who are dual members of the Pacific Coast Stock Exchange and other exchanges in return for fund brokerage business on other exchanges, primarily the NYSE. All the net profits of IDS's subsidiary and about 40 to 50 percent of the net profits of Waddell & Reed's and of Imperial Financial Services' subsidi-

aries have been applied to reduce advisory fees payable by the funds in those complexes.

Widespread emulation by institutional investors of the precedent set by these four complexes could have a marked effect on the economics of the securities industry. Within the framework of the existing commission rate structure it is a method whereby mutual fund shareholders can derive greater benefits than they have heretofore received from fund brokerage commissions. However among dealer-distributed funds the important role that portfolio brokerage plays in the competition for dealer favor has kept fund managers, with few exceptions, from using exchange memberships to reduce costs of the funds.

Similar competitive factors have also operated against the use, for the benefit of the funds and their shareholders, of regional exchange rules permitting give-ups to any member of the NASD on transactions executed on those exchanges. It would not be inconsistent with those rules for dealer-distributed funds to direct give-ups to their adviser-underwriters, all of whom are NASD members, for the purpose of applying these give-ups to reduce the advisory fees payable by the funds. Unless and until such procedures become widespread, any adviser-underwriter to a dealer-distributed fund who chose to utilize fund brokerage in this manner would place itself at a disadvantage in competing for the interest of nonmember dealers in selling the fund shares which it distributes. (Footnotes omitted.)

This passage followed an earlier summary in which PPI had written, beneath the heading "(c) Impact of mutual fund reciprocal and give-up practices," p. 16:

Under existing commission rate structures, mutual fund shareholders could derive greater benefits from their brokerage commissions if the give-up portions of the commissions were transmitted to the funds themselves or their adviser-underwriters for the purpose of reducing

management costs. However, in the face of competitive pressures managers of the dealer-distributed funds have not used brokerage for this purpose. (Footnote omitted.)

Postponing further developments on the SEC front for discussion in Part III of this opinion, we turn with this background to the case at hand.

## II. The Proceedings in the District Court.

This action was brought in July, 1968 by two stockholders of American Investors Fund, Inc. (the Fund) on behalf of the Fund. The Fund is a diversified open-end, no-load management investment company registered under the Investment Company Act. From the date of its organization in 1957 until July, 1966, its investment adviser and manager was American Investors Corporation; since that date the adviser and manager has been Chestnutt Corporation. We shall refer to the two collectively as the Adviser. The chief figure both in the Fund and the Adviser has been George A. Chestnutt, Jr. The amended complaint alleged that as a result of the growth of the Fund, fees paid to the Adviser rose from such modest amounts as $93,347 in 1963 and $187,083 in 1964 to figures exceeding $1 million in the period 1967–70, the highest being $1,557,000 in 1969.

The supplemental complaint continued with allegations concerning the Fund's brokerage fees and the "allocations" of these, as shown in the following table:[4]

| | Brokerage fees | Allocated to brokers who had provided helpful information | Allocated to brokers who had assisted in the sale of Fund Shares |
|---|---|---|---|
| 1964 | $ 275,000 | $ 162,000 | $ 113,000 |
| 1965 | 387,000 | 247,000 | 140,000 |
| 1966 | 551,668 | 261,913 | 289,755 |
| 1967 | 1,995,087 | 935,966 | 1,059,121 |
| 1968 | 3,122,160 | 2,022,457 | 1,099,703 |
| 1969 | 2,489,281 | 1,196,059 | 1,293,222 |
| 1970 | 2,059,234 | 1,108,667 | 950,000 |

4. Since the sum of the second and third columns approximately equals the first, they substantially overstate the amount of commissions that would have been recaptured on any view.

5. A separate action, Fogel v. Chestnutt, 67 Civ. 60 (S.D.N.Y.), was brought in January, 1967,

The supplemental complaint[5] continued that, by awarding reciprocal brokerage, sales of Fund shares are stimulated (with attendant increases in the advisory fee), and brokers are used to furnish advisory services the Adviser is obligated to provide. Thus the Adviser has in effect received compensation exceeding the amounts provided in the investment advisory contract. Although an affiliate of the Fund or the Adviser could have been empowered to act as the Fund's broker and save a portion of the brokerage commission, this was not done because the Adviser "prefers to profit from such brokerage transactions used to pay its obligations by awarding the Fund's brokerage commissions to others." In what is probably its crucial paragraph the supplemental complaint alleged:

The Fund or the Investment Adviser could have organized an affiliate for the purpose of reducing the net brokerage commissions paid by the Fund. This affiliate could have recaptured the Fund's brokerage commissions on various regional exchanges since at least January, 1965. Defendants Chestnutt, Sabel, and Greene intentionally misled and misinformed the Fund's unaffiliated directors by telling them that such recapture was not available to the Fund.

The adviser and four of its directors—Chestnutt, Sabel, Currier and Greene—who had been served filed an answer denying most of the non-formal allegations of the complaint and pleading various affirmative defenses. The only one of importance was:

27. The Fund has received the benefit of brokerage services equal in value to the brokerage commissions paid by it at the regular, customary and required minimum rates for transactions on national securities exchanges, and the Fund has received the benefit of brokerage services equal in value to brokerage commissions paid by it in accordance with regular and

charging that I.O.S. Ltd., there a defendant, had caused a corporation which it dominated to cause the Fund to use a particular broker when that broker's research and advisory services were channeled to I.O.S. and not to the Fund. See Fogel v. Chestnutt, 296 F.Supp. 530 (1969).

customary rates obtaining in other markets, all in accordance with rules and regulations of national securities exchanges and associations authorized and empowered by law to determine brokerage practices, rates and procedures, and this action may not be maintained.

Although the parties had initially demanded a jury trial, this was waived. A pretrial order directed that the issue of liability be tried separately. Various facts were stipulated. These included that until 1971 defendant Stanley L. Sabel was senior vice president, secretary and a director of the Fund, and vice president, secretary, general counsel and a director of the Adviser; that his law firm of Sutton, Sabel & Schupp became counsel to the Fund about 1966, and that Sabel owned 16% of the stock of the Adviser; that Clendon H. Lee, whose wife owned 1% of the stock of the Adviser, was special counsel to and a director of the Adviser, became special counsel to the Fund in 1965, and had acted since 1967 as counsel for the Adviser and the served defendants in this action; and that defendant Currier owned 2% of the stock of the Adviser. The stipulation included facts as to the acquisition of membership in the Pacific Coast Exchange and the reduction of advisory fees through the recapture of commissions by Waddell & Reed, Inc., Investors Diversified Services, Inc., the Channing Complex, and Imperial Financial Services, substantially as stated in PPI, pp. 1314–1316 supra. There was also a stipulation concerning the degree of consideration given to recapture

by the directors of the Fund and the advice on that subject by Sabel and Lee, of which more hereafter. There was some narrowing of plaintiffs' contentions and a 17-paragraph statement of defendants' answers.

■ After trial Judge Wyatt rendered an opinion dismissing the action on the merits, 383 F.Supp. 914. Accepting the principle "that defendants were under a duty by all proper means to secure for Fund the return of excess brokerage commissions," he concluded it had not been shown "that defendants could have properly secured any return for Fund," 383 F.Supp. at 920. Assuming *arguendo* that *Moses v. Burgin* had been correctly decided, he viewed it as distinguishable on the ground that the fund there concerned was a load fund whose shares were sold by an affiliated underwriter, who was qualified as a "dealer" within the NASD definition of that term and who was in fact a member of the NASD entitled to receive customer-directed give-ups on certain regional exchanges until the abolition of such give-ups on December 5, 1968. Recognizing that NASD membership was not required for membership on the Philadelphia-Baltimore-Washington Exchange, Judge Wyatt ruled that such membership [6] "would require defendants to pretend that the new subsidiary was a broker, when in fact it was not, for the purpose of securing a preference over other investors by recapturing a part of the fixed commissions" and that this would have run counter to public policy, 383 F.Supp. 920–21. The plaintiffs have appealed.[7]

---

This case was "statistically closed" on April 25, 1975.

6. Institutional memberships, with some exceptions, were prohibited following the adoption of Rule 19b–2 which ultimately became effective March 29, 1973, under the Securities Exchange Act of 1934, see 17 C.F.R. § 240, 19b–2 (1973).

7. We decline to yield to defendants' urging that we make a "threshold" disposition without reaching the merits, on the ground of plaintiffs' failure to allege with sufficient "particularity" their efforts to obtain action from the directors or their reasons for failing to do so, as required by F.R.Civ.P. 23.1; cf. *Brody v. Chemical Bank*, 482 F.2d 1111 (2 Cir. 1973). Defendants refer

to our decision in *Papilsky v. Berndt*, 503 F.2d 554 (2 Cir. 1974), as having "carefully reserved the right *after trial* to obtain judgment of dismissal for failure to comply with Rule 23.1" (emphasis in original), Defendants-Appellees' Brief at 31. The most casual reading of *Papilsky* would show that what was said on the subject of reservation was addressed to a situation in which objection had been made before trial and overruled by the trial judge. While the answer in this case made a formal denial of the paragraph of the complaint which sought to show compliance with F.R.C.P. 23.1, no issue of non-compliance was included in defendants' 17 contentions listed in the pre-trial order. We regard the point as having been abandoned.

### III.

Before analyzing the legal issues it will be convenient to update the discussion of administrative developments in Part I of this opinion, which we left with the publication of PPI at the end of 1966. A year later the SEC announced in Release No. 8239 that it had under consideration proposed Rule 10b–10, an effort to implement the suggestion put forward in PPI, which we have quoted, that "it would not be inconsistent with [the] rules [of certain regional stock exchanges] for dealer-distributed funds to direct give-ups to their adviser-underwriters, all of whom are NASD members, for the purpose of applying these give-ups to reduce the advisory fees payable by the fund." Having identified "its antecedents" in PPI, Release No. 8239 went on to explain that

> the reasoning on which the proposed rule is based is that if, as pointed out [in PPI] a mutual fund manager has various means at his disposal to recapture for the benefit of the fund a portion of the commissions paid by the fund, he is under a fiduciary duty to do so. Furthermore, diversion of such commissions to benefit an investment company manager may be viewed as additional compensation to the manager for handling the portfolio transactions of the fund within the meaning of, and in violation of, Section 17(e)(1) of the Investment Company Act. The proposed rule therefore reflects a duty on the part of mutual fund managers as fiduciaries not to use commissions paid by their beneficiaries for the benefit of the fiduciary when practices, procedures, and rules of the markets in which such fiduciaries act permit their beneficiaries to receive tangible benefits in the form of reduction of the charges now borne by them.

The proposed Rule was as follows:

Rule 10b–10

(1) It shall be unlawful for any registered investment company or affiliated person of such registered investment company* to directly or indirectly, to order or request any broker or dealer:

(a) to pay or arrange for the payment, directly or indirectly, of all or any portion of a commission on any securities transaction to any broker, dealer or any other person *unless* pursuant to a written contract the full amount of such remittance is required to be paid over to such registered investment company, or fees owed by or charged to such registered investment company are required to be reduced in an amount equal to the remittance;

(b) to designate or employ any broker or dealer on any transaction to transmit, execute or clear a transaction or to *perform* any other function for which compensation is required or made *unless* pursuant to a written contract the full amount of such compensation is required to be paid over to such registered investment company or fees owed by or charged to such registered investment company are required to be reduced in an amount equal to such compensation.

(2) For the purposes of this rule a person is affiliated with a registered investment company if such person:

(a) is an officer, director, trustee, employee, investment adviser, member of an advisory board, depositor, promoter of or principal underwriter for the registered investment company, or

(b) directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with the registered investment company, its investment adviser or principal underwriter, or

(c) directly or indirectly owns, controls, or holds with the power to vote, five per centum or more of the outstanding voting securities of the registered company.

The Release added a highly significant footnote keyed to the initial reference to a "registered investment company":

> * Although the proposed rule is couched only in terms of persons who are affiliates of and fiduciaries to investment companies, the principles which are set forth above may be equally applicable to other managers of pooled funds who act in a fiduciary capacity and who are able to reduce the portfolio commissions of their beneficiaries. To the extent that such managers direct give-ups for their benefit, when they are in a position to utilize them for the benefit of beneficiaries, it would appear that under the Federal Securities Laws or otherwise, this use of give-ups other than for the benefit of these beneficiaries would also constitute an improper practice by such fiduciaries. Accordingly, the Commission believes that it is appropriate to solicit comment on this issue and will consider whether the proposed Rule 10b–10 should be applicable to other fiduciaries who manage pooled funds.

In the same release the SEC called for comment on a proposal by NYSE directed to its members dated January 2, 1968. The NYSE proposal, although extremely vague, contemplated a volume discount, "continuation of the practice of customer directed give-ups on their own transactions with a limitation on the percentage amount which may be so given-up," and the taking of "steps to prohibit reciprocal practices which result in de facto rebates of NYSE commissions even where those arrangements involve other markets than the NYSE floor, provided that the SEC will aid in prohibiting such practices in other markets." Apparently cheered by NYSE's first indication of willingness to consider a volume discount, the SEC characterized the NYSE proposal as "to a significant extent an alternative approach" to the proposed Rule 10b–10, saying:

> While the New York Stock Exchange proposal and proposed Rule 10b–10 are not mutually exclusive on all points, the New York Stock Exchange proposal is, to a significant extent, an alternative approach. Insofar as the New York Stock Exchange proposal would provide institutional investors with a volume discount while at the same time closing, insofar as possible, the various avenues by which an institutional manager can recoup commissions for the benefit of the fund, it could, depending upon the nature and extent of the volume discount, provide a direct rather than an indirect means by which institutional investors may obtain the benefit of lower charges.

During 1968 there were various communications between the SEC and NYSE, recounted in *Gordon v. New York Stock Exchange, supra*, 422 U.S. at 670, 95 S.Ct. 2598, 43 U.S.L.W. at 4961, which culminated in the establishment of a volume discount for orders exceeding 1,000 shares and other alterations in rates. In a letter proposing the volume discount, NYSE also stated that it would be impossible to determine the impact of the interim schedule so long as give-ups continued. Accepting the NYSE proposals in a letter of August 30, 1968, released as a formal decision "Approving Interim Commission Rate Measures," SEC Chairman Cohen replied:

> Your letter . . . states that [the various exchanges would] "prohibit customer-directed give-ups of work or money in consideration of listed business . . ." We understand that this change is intended to prohibit all forms of customer-directed give-ups, but is not meant to preclude or interfere with non-customer directed interdealer reciprocal business on regional exchanges nor is it designed to prevent the procedures whereby broker-dealer affiliates of institutions may credit or return commissions to institutions with which they are affiliates.

Not predisposed to endure both volume discounts in fixed commissions *and* the system of give-ups by which fixed rate commissions had been evaded, NYSE abolished give-ups effective December 5, 1968 and the regional exchanges followed suit. In anticipation of this the SEC had issued an order on December 3, 1968 directing future mutu-

al fund prospectuses to reflect changed stock exchange rules prohibiting "customer-directed give-ups" but nothing was said about the proposed Rule 10b–10, which presumably had become unnecessary, or about the qualification mentioned in Chairman Cohen's letter.

The next item is a letter of November 10, 1969 from SEC General Counsel (now Commissioner) Loomis in response to an inquiry about the duties of funds to recapture. Mr. Loomis replied, in pertinent part, as follows, Securities and Exchange Act Release No. 8746, CCH Federal Securities Law Reports ¶ 77,761:

> You first ask whether mutual fund management has a fiduciary duty to acquire a stock-exchange seat directly or through an affiliate, in order to utilize this means to recapture brokerage which in turn will be offset against management charges. We do not believe that management has this duty if in the exercise of its best business judgment management determines that it is not in the best interests of the fund to create such an affiliate. Proposed Rule 10b–10, as published for comment on January 26, 1968, to which you refer, has been withdrawn.
>
> As you suggest, the statements in letters from the Commission to stock exchanges in connection with their adoption of rules abolishing the customer-directed give-ups, that the Commission understood that these rules were not designed to terminate procedures whereby institutions may obtain returns of commissions merely reflected, in our view, that the exchange rules with respect to customer-directed give-ups did not, and were not intended to, terminate the existing arrangements which a few mutual fund organizations have made for the indirect recapture of a portion of their commissions. It is my understanding that this is not presently accomplished by means of customer-directed give-ups, which have been abolished but in other ways, primarily by reciprocal practices. If these reciprocal practices are available to fund managements, it did not seem appropriate to

foreclose their use to benefit the fund itself.

> It should be understood, however, that if mutual fund management does acquire a seat on a regional stock exchange whose rules permit the recapture of commissions paid by the fund through the use of that seat, there may be circumstances under which such recapture could be required and that the management may not be free to simply retain for itself revenues derived from this source. This is particularly likely to be true where the affiliate on the exchange does not execute or clear transactions for the account of the fund, but merely receives revenue from other brokers, which revenue is attributable to transactions executed for the account of the fund by such other brokers. . . .
>
> In your letters you suggest various courses of action which the Commission might take with respect to the question of so-called "institutional membership" and other aspects of the commission rate structure. Decisions on these matters will have to await further developments in the inquiries concerning the commission rate structure to which I referred earlier.

Having achieved establishment of the volume discount, the SEC then turned to another objective, bringing about competitive rates on large orders. The history of this endeavor is also recounted in the *Gordon* opinion, 422 U.S. at 671, 95 S.Ct. 2598, 43 U.S.L.W. at 4962. On February 4, 1972, the SEC issued a Policy Statement on the Future Structure of the Securities Markets, CCH Federal Securities Law Reports No. 409. This wide-ranging statement included several passages bearing on the problems here presented. One was this, pp. 42–43:

> [W]e believe that the cost of selling and purchasing mutual fund shares should be borne by the investors who purchase them and thus presumably receive the benefits of the investment, and not, even in part, by the existing shareholders of the fund who often derive lit-

tle or no benefit from the sale of new shares. To impose a portion of the selling cost upon the existing shareholders of the fund may violate principles of fairness which are at least implicit in the Investment Company Act.

Finally, the practice of compensating broker-dealers for mutual fund sales by assigning them commission business violates the long accepted precept in investment company regulation that an investor is entitled to know how much was paid to those who sell him an investment. This practice puts the investment company in the position of issuing a prospectus which purports to specify the sales compensation but fails to quantify the additional compensation paid to the customer's broker-dealer in the form of commission business awarded on the basis of success in selling investment company shares.

The Commission believes it should be made clear now that these reciprocal practices must be terminated. When the NASD completes its study of what it considers to be a fair load for the sale of investment company shares, as required by the Investment Company Amendment Act of 1970, it will be in a position to recommend a sales charge which reflects the full incentive appropriate to such sales and which can be fully and explicitly disclosed to the buyers of such shares. To accomplish this the Commission is sending a letter to the NASD setting forth the Commission's views and requesting the NASD to direct its members to discontinue the use of reciprocal portfolio brokerage for the sale of investment company shares. If such a response is not forthcoming, the Commission will then consider rule-making to accomplish the desired result.

Another was this, pp. 44, 46–49:

*Institutional Membership*

The question of institutional membership on national securities exchanges is an exceedingly difficult one, and in dealing with it we have painstakingly reviewed the alternatives presented to us.

It is the Commission's firm view that, as a central market system develops, it should have at its heart a corps of professional brokers and market makers serving investors. Moreover, in light of the strain which the magnitude and tempo of the transactions of financial institutions currently place on the securities markets, it is our view that institutions should not be permitted to deal through brokerage firms established principally to handle their own transactions but should be required to deal through brokers dedicated primarily to serving and having fiduciary obligations to a broad investing public. Thus, as a general rule, the Commission believes that membership in the central market system should be open only to those who meet qualifying standards and who have the primary purpose of serving the public as brokers or market-makers

. . .

Certain regulatory problems arise out of the relationships created by institutional membership. The first stems from the existence of a structure of fixed minimum commissions. So long as such a structure exists, large investors should not, by virtue of their economic power and size, be entitled to obtain rebates of commissions not available to other investors. While fixed minimum commissions exist, they should apply to all investors, and an exception should not be given to a particular person. Institutional membership, however, provides a vehicle for obtaining rebates, either directly or indirectly.

Second, institutional membership may result, to a greater or lesser degree depending on the circumstances, in the use of exchange membership for private purposes rather than for the purpose of serving the public in an agency capacity or otherwise performing a useful market function. In part, this problem is similar to that discussed in the preceding paragraph: the problem of using exchange membership as a means of obtaining a reduced commission rate. But the problem of using exchange facilities for private purposes is broader in scope than the

rate question. For we believe that membership in the market system should be confined to firms whose primary purpose is to serve the public as brokers or market makers. Stock exchanges are affected with an overriding national interest which demands that they act to maintain and improve the public's confidence that the exchange markets are operated fairly and openly. The public should have the assurance that a member of an exchange is dedicated to serving the public, and membership by institutions not predominantly serving non-affiliated customers should not be permitted to cloud this objective.

Our authority to deal with these problems derives from the stated purposes of the Securities Exchange Act and is most specifically expressed in Section 19(b) of such Act which deals with "such matters as . . . the fixing of reasonable rates of commission, interest, listing, and other charges . . . and . . . similar matters". ·

Insofar as institutional membership employed primarily as a vehicle for obtaining recapture of commissions, as in the first situation described above, it should not be allowed to exist. Membership under those circumstances is plainly in conflict with the concept of fixed minimum commissions and results in exchange membership solely for private purposes. We believe that such membership and practices which permit the rebate or recapture of commissions, directly or indirectly, should be eliminated. The Commission intends to act promptly to terminate this type of membership. The

regional exchanges, as vital elements of the central market system, should compete on their merits as market components and should not need this special competitive tool.[8]

In response to this Report, see ¶ 78,906 Fed.Sec.L.Rep. (1972), NASD proposed a rule to abolish reciprocals; this rule became effective July 15, 1973, see ¶ 79,414 Fed.Sec. L.Rep. (1973). By contrast, the validity of the SEC's conclusions on the evil of institutional memberships, which were quite at variance with the earlier pronouncements we have quoted, was vigorously challenged, notably by Elkins Wetherill, president of the PBW Stock Exchange, see Wetherill and Hendon, Institutional Membership and the Experience of the Philadelphia-Baltimore-Washington Stock Exchange, 13 Boston College Ind. & Com. Rev. 959 (1972). Senator Williams introduced a bill, S. 3169, 92d Cong. 2d Sess. (1972), which would remove the SEC's power to restrict institutional membership until one year after the effectiveness of a rule requiring negotiated rates on all transactions exceeding $100,000. Nevertheless, the SEC promulgated Rule 19b–2, effective March 29, 1973, forcing every exchange to "require every member of such exchange to have as the principal purpose of its membership the conduct of public business." [9]

The story finds its end in the Securities Act Amendments of 1975,[10] 89 Stat. 97, which, of course, were not available to Judge Wyatt. Section 11 of the Securities Exchange Act was amended so that, subject to certain exemptive powers of the SEC, and exceptions not here material, exchange transactions for one's own account or that

---

8. Commissioner Owen dissented from so much of the report as would allow an institution to establish or acquire a broker-dealer if the latter did business "predominantly with public investors." He thought doing business for the parent should be prohibited since any such relationship "permit[s] of a rebate situation, either directly or indirectly," at 61–62.

9. A member was to be deemed to have such a purpose only if 80% of its securities business was "effected for or with persons other than affiliated persons" or was one of eight described categories. PBW challenged the validity of

the rule, but this challenge was dismissed on jurisdictional grounds, *PBW v. SEC*, 485 F.2d 718 (3 Cir. 1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1992, 40 L.Ed.2d 558 (1974).

10. S. 470, the predecessor of the Amendments ultimately enacted, would have continued institutional memberships so long as fixed rates were being phased out, and would have required the SEC to withdraw Rule 19b–2 during this period. Sen.Rep.No.93–187, 93 Cong. 1st Sess. (1973).

of an associate, would be unlawful, subject to a three-year phasing out provision for persons who were exchange members on May 1, 1975, 89 Stat. 110. Section 6 was also amended to provide that "no national securities exchange may impose any schedule or fix rates of commissions, allowances, discounts, or other fees to be charged by its members," subject to a one year extension for floor brokers and odd-lot dealers and a "fail-safe" provision for the reinstitution of such schedules if the SEC approved, 89 Stat. 107.

### IV. *The Basis of Liability.*

Plaintiffs assert two different theories of liability for defendants' failure to make efforts to recapture. One is that such efforts were required by Fund's certificate of incorporation; the other is that they were required as a matter of fiduciary duty—or perhaps more accurately that management was obliged as a matter of fiduciary duty to put the problem fairly before the independent [11] directors. While both theories demand some further showing of the possibility and legality of recapture, we observe that the obligations entailed by the contract theory might well be more severe than those entailed by the theory of breach of fiduciary duty.

The contract argument is as follows: The Certificate of Incorporation of the Fund provided in ¶ 3(c)(iv) that:

> The public offering price of each share of capital stock shall be the net asset value then in effect plus the load or commission charged adjusted to the nearest full cent. Any load or commission for the distribution of shares of the Corporation by a distributor may be fixed from time to time by the By-Laws of the Corporation, but shall in no event exceed 8½% of the public offering price, nor shall the consideration per share to be received by the Corporation after deduction of such load or commission be less than the net asset value. . . ."

The by-laws made no provision for a sales load or commission. A direct payment of commissions from the Fund's treasury to brokers selling shares of the Fund would thus have violated the charter. There is no significant difference when the Fund allows selling brokers to receive commissions which it could have "recaptured." A similar argument, made by the same counsel, was accepted in *Moses v. Burgin, supra,* 445 F.2d at 374.[12]

Although the argument is not without force, we think it presses too far. The term "net asset value" is one of art in the

11. Section 5 of the Investment Company Amendments Act of 1970 strengthened the requirement that at least 40% of the directors of an investment company not be "affiliated persons" by substituting the term "interested persons," 15 U.S.C. § 80a–10(a). "Interested persons" includes, in addition to "affiliated persons," "members of the immediate family of such affiliated persons and persons who have beneficial interests or legal interests as fiduciaries in securities issued by the investment adviser," "any broker-dealer" "and affiliated persons of any such broker dealer," and legal counsel for the Fund or the adviser. Sen.Rep. No.91–184, 3 U.S.Code Cong. & Admin.News, p. 4928 (1970). An "affiliated person" is:

(A) any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting securities of such other person; (B) any person 5 per centum or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by such other person; (C) any person directly or indirectly controlling, controlled by, or under common control with, such other person; (D) any officer, director, partner, copartner, or employee of such other person; (E) if such other person is an investment company, any investment adviser thereof or any member of an advisory board thereof; and (F) if such other person is an unincorporated investment company not having a board of directors, the depositor thereof.

15 U.S.C. § 80a–2(a)(3). Since the expanded requirement, although it does affect a present defendant, does not decisively tip the interested/disinterested balance, we shall use the term "independent" throughout to indicate persons either not "affiliated" prior to the 1970 amendments or not "interested" thereafter.

12. A comment on *Moses* raises the question why, if this theory were sound, the court went on with an extensive discussion, 445 F.2d at 377, et seq., of management's duty to make full disclosure to the unaffiliated directors and the apparent resting of liability upon that ground. *Butowsky, supra* n. 1, 749–50 (1971).

mutual fund industry and is elaborately defined in the certificate of incorporation. The objective of the charter provision was to prevent dilution of per share net asset value by the issuance of new shares at a discount; defendants' failure to recapture part of the commissions on portfolio transactions does not result in such dilution. Plaintiffs' real complaint is not that new shareholders did not pay net asset value but that the Adviser, for selfish motives, refrained from handling portfolio transactions in a manner that would have diverted a portion of the commissions to itself, with an attendant decrease in the advisory fee—in substance a charge of breach of a fiduciary duty resulting in corporate waste.

When we pass to the theory of breach of fiduciary duty, we are confronted initially with the question of the applicable standard. The *Moses* court predicated federal jurisdiction on § 36 of the Investment Company Act prohibiting " 'gross misconduct or gross abuse of trust' " 445 F.2d at 373, and seemingly also held, 445 F.2d at 384, that defendants' conduct violated that standard as the First Circuit had interpreted it in *Aldred Investment Trust v. SEC*, 151 F.2d 254, cert. denied, 326 U.S. 795, 66 S.Ct. 486, 90 L.Ed. 483 (1946). Taking a less expansive view of § 36 as originally enacted, we have held that the Act implicitly established a federal standard of fiduciary duty in respect of dealings between a mutual fund and its adviser. *Brown v. Bullock,* 294 F.2d 415, 421 (2 Cir. 1961); *Rosenfeld v. Black,* 445 F.2d 1337, 1345 (2 Cir. 1971), a duty which the 1970 amendment makes explicit "with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any

affiliated person of such investment adviser"—the situation presented here.

■ We agree with the First Circuit, 445 F.2d at 376, that under the scheme of the Investment Company Act an investment adviser is "under a duty of full disclosure of information to . . . unaffiliated directors in every area where there was even a possible conflict of interest between their interests and the interests of the fund"—a situation which occurs much more frequently in the relations between a mutual fund and its investment adviser than in ordinary business corporations, see *id.*; Comment, Duties of the Independent Director in Open-End Mutual Funds, 70 Mich.L.Rev. 696, 698–99 (1972); Mundheim, Some Thoughts on the Duties and Responsibilities of Unaffiliated Directors of Mutual Funds, 115 U. of Pa.L.Rev. 1058, 1060–61 (1967). Chief Judge Aldrich went on to quote from the SEC's decision in *Imperial Financial Services, Inc.,* CCH Fed.Sec.L.Rep. ¶ 77,287 at 82,464 (1965), as we do in the margin.[13] He emphasized that the communication of information must be "effective," bearing in mind that the independent directors are not full-time employees and that "neither their activities nor their experience" may be "primarily connected with the special and often technical problems of fund operation." He concluded:

> If management does not keep these directors informed they will not be in a position to exercise the independent judgment that Congress clearly intended. The only question can be whether the matter is one that could be thought to be of possible significance.

■ Although the Fund apparently would have qualified for the single unaffiliated director exception of § 10(d), it had never availed itself of this.[14] One indepen-

---

13. The Investment Company Act's requirement as to unaffiliated directors, if its purposes are not to be subverted, carries with it the obligation on the part of the affiliated directors, and the investment adviser itself, to insure that unaffiliated directors are furnished with sufficient information so as to enable them to participate effectively in the management of the investment company.

14. We reject the suggestion implicit at some parts of defendants' brief that adequate knowledge by one unaffiliated director would suffice even when a fund has opted to have several; shareholders rely on what the fund has done rather than on a lesser requirement, of which the Fund did not avail itself.

dent director, Richard Radcliffe, who served from 1958 until December, 1969, was highly sophisticated in investment company matters. None of the others appear to have been, although they had experience in other forms of business.[15]

The data yielded by the record on the subject of disclosure is as follows:

The pre-trial order states:

Subsequent to the filing of an action by these identical plaintiffs in this Court, against these defendants and others in January, 1967, (67 Civ. 60) which claimed, among other things, impropriety in connection with brokerage commissions charged on Fund portfolio transactions, Messrs. Sabel and Lee advised all of the directors of the Fund and the Adviser on numerous occasions, including meetings of such Boards, that no impropriety had been found in connection therewith. On or about February, 1968, upon the issuance by the Securities and Exchange Commission of its 1934 Act Release No. 8239 dated January 26, 1968 proposing a new Rule 10b–10 (which proposal the Commission later withdrew), Messrs. Sabel and Lee specifically advised all of the directors of the Fund and the Adviser that the suggested form of "recapture" contained in such proposed, but never adopted, new Rule 10b–10 by its express terms applied only to "dealer-distributed funds", rather than a no-load fund such as the Fund which has no "distributor" or "underwriter", and Messrs. Sabel and Lee advised that the question of possibility of recapture of brokerage commissions which the Fund is compelled to pay upon execution of portfolio transactions does not arise.

There are no writings reflecting any discussions or deliberations by any of the Fund's directors with respect to recapture.

Plaintiffs also offered defendants' answer to their Interrogatories Nos. 5, 6 and 7, which read as follows:

5. (a) State whether at any time from January 1, 1963 to the present any of the defendants discussed with or otherwise informed any unaffiliated directors of the Fund of the possibility of recapturing the Fund's brokerage commissions in any manner whatsoever, including but not limited to membership on regional exchanges, or N.A.S.D. affiliation by Chestnutt Corp. (the "investment adviser").

15. The following chart represents the composition of the Fund's board of directors during the relevant period:

| 1963 | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 | 1971 | 1972 | 1973 |
|------|------|------|------|------|------|------|------|------|------|------|
| George A. Chestnutt, Jr.* (affiliated) | | | | | | | | (interested) | | |
| Stanley Sabel * (affiliated) | | | | | | | | (interested) | | |
| John Currier * (unaffiliated) | | | | | | | | (interested) | | |
| Eliz. Sullivan (affiliated) | | Warren K. Greene * (affiliated) | | | | | | (interested) | | |
| Richard Radcliffe (unaffiliated) | | | | | | Wm. Semmes (disinterested) | | | | |
| Frank G. Fowler (unaffiliated) | | | | | | | | (disinterested) | | |
| Francis L. Veeder (unaffiliated) | | | | | | | | (disinterested) | | |
| P. Murtaugh (unaffiliated) | | Wm. May (unaffil.) | | vacant | | | | Eugene Ulrich (disinterested) | | |

* Defendants who were served.

(b) If the answer to (a) above is in the affirmative, identify and describe each such discussion and all memoranda, minutes and other writings referring to such discussions.

6. State whether at any time from January, 1963 to the present any discussion of the possibility of Exchange membership for the Fund, the investment adviser or any affiliate of the Fund or the investment adviser was discussed between or among any directors of the Fund or the investment adviser, and if so identify and describe each such discussion, including the time, place and persons present, and all memoranda, minutes or other records referring to such discussions.

7. (a) Identify and describe, by time, place and persons present, all meetings of the boards of directors of the Fund or the investment adviser from 1963 to the present at which the possibility of recapturing brokerage commissions was discussed.

(b) State whether there is any existing record of such discussions, including but not limited to memoranda, minutes, correspondence or tape recordings.

The answer, omitting one paragraph which does not differ in substance from the first paragraph quoted from the pre-trial order, was as follows:

All directors of the Fund knew and have always known since becoming directors that the Fund was a "no-load" Fund and sells its shares directly by mail, and to some extent upon receipt of telephone orders, to subscribers who become Fund shareholders by such direct purchases without the intervention of, or any commission payable to, any broker or dealer, or underwriter. Accordingly, the Fund differs from most other mutual funds in that it is not "dealer-distribut-ed", nor is there any "underwriter", nor is there any broker or dealer affiliated with the Fund or affiliated with the Adviser or affiliated with any officer or director of either and all directors of the Fund have known these facts at all times.

No director has suggested that the Adviser divert its resources, efforts and talent from advice and management of investments to enter the new, untried and risky business of public brokerage or underwriting as one of many prerequisites to becoming a member of an exchange or of the N.A.S.D. The management of the Adviser understands that unaffiliated directors of the Fund are and have been categorically opposed to any brokerage or underwriting activity by the Adviser or such activity by any new brokerage or underwriting entity which might be created by or at the instance of the Adviser, because of the inherent conflict of interest and the diversion of attention and resources from investment advice and management.

All Fund directors have had brought to their attention the February 1972 statement by the Securities and Exchange Commission relating to the future structure of securities markets, including the separate statement by its senior member, Commissioner Owens, expressly disapproving any brokerage functioning whatever by an affiliate of a mutual fund on its behalf, as constituting a clear conflict of interest, as well as the majority text suggesting the propriety of stock exchange membership and brokerage functioning where the brokerage activity was preponderantly for the public, together with informal Commission statements indicating that any brokerage whatever for an affiliated mutual fund should be permitted only where 80% of the brokerage business was with the general public as distinguished from any affiliated mutual fund. The Adviser, upon advice of counsel, and in view of widely varying conten-

tions advanced in legislative committees, conflicting views within the Securities and Exchange Commission, and widely varying views within the securities industry with respect to market structure, commission rate structure, applicability of antitrust laws, access to markets, and a variety of other matters, has in 1972 caused incorporation papers to be drawn for a possible brokerage subsidiary of the Adviser, which incorporation papers have not been filed pending clarification of legislative and practical considerations in the future, and the unaffiliated directors have been so informed . . .

Defendants do not believe that there are any papers or writings referring to any such discussion but defendants are continuing to search for any. Such advice from counsel has been on a continuing basis, including conferences with defendants in connection with the defense of both actions brought by these plaintiffs and in connection with periodic review of the Fund's Prospectus.

The testimony of the independent directors indicated nothing more in the way of disclosure. Director Radcliffe endorsed the language in prospectuses of two T. Rowe Price funds [16] and said that it would be improvident to participate in the brokerage business. Director Ulrich, who joined the board only in 1971, considered it a "conflict of interest" for the adviser "even to be connected with brokerage." Director May, who left the board in 1965, never recommended the formation of a brokerage firm—something plaintiffs likewise have not suggested. Director Currier, whose status changed from "unaffiliated" to "interested" on December 14, 1970, by virtue of § 5 of the Investment Company Act Amendments Act of 1970, see fn. 11, also professed to be opposed even to the possibility of having the adviser participate in brokerage. With the possible exception of Director Radcliffe (as to whom see note 16), it is not clear at all that any of these witnesses thoroughly understood the forms of recapture which the plaintiffs propose.

The testimony of the other directors was as follows: In answer to a question whether counsel had advised that forming an NASD affiliate or securing an "introducing mem-

---

**16.** The passage from the Rowe Price New Era Fund, Inc. prospectus dated May 1, 1973, Radcliffe endorsed read:

The Securities and Exchange Commission has recently adopted a rule which requires national securities exchanges to grant membership access to institutions, which for this purpose would include the Fund and [the Adviser], provided that the primary purpose of membership is to transact public business. [The Adviser], which has since its inception taken the position that the business of rendering investment supervisory services should be separated from the brokerage business, has informed the Fund that, in its opinion, the possible advantages of exchange membership are insufficient to overcome the disadvantages. Exchange membership would have the effect of reducing brokerage costs of the Fund, either directly (if the Fund were the member), or through a "recapture" arrangement (if [the Adviser] were the member); however, it would also divert the energies and financial resources of [the Adviser] from the business of rendering investment supervisory services to the conduct of a public brokerage business, and would create a

potential conflict between the desire to reduce commission costs and the possibility that better price and execution could be obtained elsewhere. In addition, the savings which might result from exchange membership would not necessarily exceed the savings to be attained through negotiated commissions on transactions through unaffiliated brokers. After considering the possible advantages and disadvantages of exchange membership in light of the views of [the Adviser], the Fund's Board of Directors, including all of the directors who are not affiliated with [the Adviser] has determined that exchange membership would not be in the best interests of the Fund or its stockholders.

As applied to this case, this passage was misleading in some respects. In addition to the reliance on negotiated rates, which were not possible for most of the period here in question, the requirement that exchange members be primarily engaged in public business dates only from March 29, 1973. Director Radcliffe nevertheless appears to have assumed that recapture was possible only by a full-fledged brokerage house.

bership" on a regional exchange was illegal, Chestnutt said they had advised against it "because it was fraught with self-dealing, with temptations of various sorts." Mr. Sabel had "repeatedly" used the hortatory expression "shoemaker stick to your last," instructing Chestnutt to stay out of the brokerage business and stick to the thing he knew best, namely, analyzing the market. When asked where the self-dealing would be if he formed an affiliate that merely received commissions and paid them back to the Fund, Chestnutt said that he did not know this was possible. Asked whether he had ever made any inquiry of the NASD or the PBW Exchange, he announced that NASD meant National Association of Securities Dealers and that it hadn't occurred to him that "it was a national association of check drop artists." Greene, vice president of the Fund and of the Adviser, thought the adviser was ineligible to be a member of NASD. Sabel testified that a copy of the 346 page PPI report had been sent to each director and that "it" had been discussed several times but that there had been no discussion of the recapture provision because, as Sabel had advised, "this didn't apply to us."

This does not add up to the effective communication of a problem to the independent directors mandated by *Moses.* To be sure, we do not have in this case direct suggestions from staff of the SEC such as those discussed in *Moses, supra,* 445 F.2d at 377. But this goes mainly to the question whether the Adviser had any duty of disclosure to the independent directors prior to issuance of PPI. When that was issued, Sabel took it on himself to decide that the SEC's recommendations did not apply to a no-load fund because the language on pp. 172–73 spoke in terms of "adviser-underwriters, all of whom are NASD members," although the basic principle stated in the

summary on p. 16 did not.[17] There is nothing to indicate that Sabel asked the SEC whether its comments had an application to no-load funds or made any inquiry as to the possibility of the Adviser's or an affiliate's obtaining NASD membership or of achieving recapture by membership on a regional exchange. There was even less basis for counsel's unceremoniously brushing aside proposed Rule 10b–10. While the introductory material began with a quotation from p. 173 of PPI, with its reference to "adviser-underwriters, all of whom are NASD members" (although with the accompanying footnote, see note 17), the next paragraph was worded more broadly and the proposed rule was in no way limited to dealer-distributed funds. Sabel's view went in the direction that his status as an officer, director and 14% owner of the Adviser led him. Reliance on such obviously casual advice from a lawyer having a personal stake adverse to the shareholders affords no protection unless it is right—in which event it is unnecessary to assert the defense of reliance.

PPI had raised a question which, in the language of *Moses,* 445 F.2d at 377, "could be thought to be of possible significance" and on which the interests of the Fund and the Adviser were in clear conflict. Congress had mandated independent directors in order "to supply an independent check on management and to provide a means for the representation of shareholder interests in investment company affairs." S.Rep.No. 91–184, 91st Cong. 1st Sess. (1969), reprinted in 3 U.S. Code Cong. & Admin.News, 91st Cong. 2d Sess. at p. 4927 (1970). The minimum requirement to enable the Fund's independent directors to discharge these duties with respect to recapture was a careful investigation of the possibilities performed with an eye eager to discern them rather than shut against them, and, if these possibilities were found to be real, a weigh-

---

**17.** Also the footnote appended to the statement on p. 172 spoke of use of "a broker-dealer affiliate"—a method equally available to no-load funds.

ing of their legal difficulties and their economic pros and cons. It would have been still better to have the investigation of recapture methods and their legal consequences performed by disinterested counsel furnished to the independent directors.[18]

■ If this had been done and the independent directors had concluded that, because of legal doubts, business considerations or both, the Fund should make no effort at recapture, we would have a different case.[19] But when there has been inadequate communication to the independent directors, it is no defense to the Adviser and those exercising control over it that a decision not to recapture, taken after proper communication, would have been a "reasonable business judgment."

Our agreement with the First Circuit in this regard is a proper projection of *Mills v. Electric Auto-Lite Co., Inc.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Apart from the salutary prophylactic effects of such a rule, courts can have little confidence in *post litem motam* expressions by independent directors as to what they would have done if management had put all the facts before them. Under the best of circumstances there is bound to be doubt about the independence of the "unaffiliated" or now the "disinterested" director, see Note, Duties of the Independent Director in Open-End Mutual Funds, 70 Mich. L.Rev. 696, 701 (1972). These should not be enhanced by recognizing a *post hoc* reconstruction of mental processes as a defense.

■ We therefore conclude that liability exists with respect to the Adviser and to defendants Chestnutt, Sabel and Greene. Under the principle laid down in *Moses, supra,* 445 F.2d at 384, we would see no basis for imposing liability on directors who

were not interested. In this respect defendant Currier is a special case; although he could be counted as unaffiliated until December 14, 1970, because of his small stock ownership in the Adviser he was in fact not disinterested. We therefore include him with the defendants held to be liable. While we do not rule on the apportionment of liability, equity would suggest the imposition of primary responsibility on the Adviser, which profited from the failure to recapture.

## V. *The Possibility of Recapture.*

The foregoing conclusion would not, of course, lead to reversal if defendants are right in saying that recapture was impossible or illegal. In this section of the opinion we will deal with the possibility of recapture, in the next section with its legality.

The record leaves little doubt that if the Advisor or an affiliate could have achieved NASD membership, it would have been entitled to give-ups on transactions executed on the PBW and Pacific Exchanges [20] (until the abolition of give-ups in December, 1968), to discounts of 25% on the Pacific Coast Exchange, and also to tender offer fees.[21]

Judge Wyatt was of the view that neither the Adviser nor an affiliate could have achieved NASD membership. The qualifications for NASD membership are as follows:

Any broker or dealer authorized to transact and whose regular course of business consists in actually transacting any branch of the investment banking or securities business in the United States, under the laws of any State and/or the laws of the United States, shall be eligible to membership in the Corporation.

---

18. This was done in *Moses* but the court found that counsel had not been sufficiently informed.

19. We do not read Mr. Loomis' letter of November 10, 1969, see p. 14 *supra,* as going beyond this.

20. Give-ups of 25% were permitted on the PBW Exchange from November, 1965 to June, 1966 when they were raised to 40%. The Pacific Coast Exchange permitted give-ups of 25%.

21. The maker of a tender offer frequently agrees to pay a fee to any NASD member named by the tendering shareholder.

Broker is defined as follows, this being an elaboration of the definition in § 3(a)(4) of the Securities Exchange Act:

> The term "broker" means any [individual, corporation, partnership, association, joint stock company, business trust, unincorporated organization or other legal entity] engaged in the business of effecting transactions in securities for the account of others, but does not include a bank.

Judge Wyatt thought the Adviser or an affiliate in directing the sale of securities from or the purchase of securities for the Fund's portfolio would not be transacting any branch of the securities business or effecting transactions in securities. More particularly it would not be doing the latter "for the account of others" since "the suggestion is that it act for the Fund alone. . . ." *Moses* presented a different case since Crosby, the distributor of the fund in that case, was a "dealer" which was entitled to be and indeed was a NASD member.[22]

■ Agreeing with the last point and admitting some force in the others, we do not find the provisions so unambiguous as to justify the defendants' thinking that NASD membership was unattainable. The Adviser and the Fund are distinct entities, one owned by the management group and the other by the investors. Many brokers have nothing to do with the execution or clearing of orders, functions which they confide to others. So far as concerns the reference to "others" rather than "another," the Adviser in the present case originates transactions for many investors in addition to the Fund; if that were not enough, something might be said for piercing the corporate veil and regarding the Adviser as acting "for the account of" the Fund's shareholders. Perhaps most important of all, such few SEC releases and court decisions as exist point to a construction of the term "broker" which could well include an adviser placing buy and sell orders for the portfolio of a mutual fund. See Distributions of Variable Annuities by Insurance Companies: Broker-Dealer Registration and Regulation Problems under the Exchange Act of 1934, Exchange Act Release No. 8389, Fed.Sec.L.Rep. ¶ 77,594 (1968) (in the context of § 15(a)(1) of the Securities Exchange Act); *Fogel v. Chestnutt,* Fed. Sec.L.Rep. ¶ 92,133 (S.D.N.Y.1968) (construing "broker" for purposes of jurisdiction under § 44 of the Investment Company Act); see also 2 Loss, Securities Regulation 1295–96 (1961); 5 *id.* 3355–56 (1969).

In order to show that the Adviser would have obtained a favorable reception if it had approached the NASD, plaintiffs offered the deposition of Lloyd J. Derrickson, the Senior Vice President and General Counsel of NASD; formerly outside counsel, beginning in 1958, he had been with NASD since 1962. The judge rejected Derrickson's testimony as "puzzling" and "not clear." While there are statements in cross-examination that give some comfort to the defendants, the final question and answer ring loud and clear:

> Q. Mr. Derrickson, if you had received an application from anyone saying that they wanted to become a member of the NASD for the sole purpose of receiving give-ups and crediting those give-ups against advisory fees charged by such applicant to a fund that it was advising, would the NASD have refused that application?
>
> Mr. Lee: Objection to the form of the question.
>
> The Witness: No, I don't think we would have refused it.

The rejection of the testimony thus was based not so much on contradictions within

---

**22.** We need not consider whether a mutual fund which sells its own shares without an underwriter is a "dealer," defined by the NASD as

> any individual, corporation, partnership, association, joint stock company, business trust, unincorporated organization or other legal entity engaged in the business of buying

and selling securities for his own account, through a broker or otherwise, but does not include a bank, or any person insofar as he buys or sells securities for his own account, either individually or in some fiduciary capacity, but not as a part of a regular business.

it as on the judge's disagreement with it as a correct interpretation of NASD's rules, a disagreement stemming in considerable measure from his view that it would have been "deceptive and improper" for the Adviser or an affiliate to have become a NASD member and therefore entitled to give-ups and discounts. The latter, however, is a separate issue, to be discussed below. Since the NASD's rules are fairly susceptible of the construction urged by plaintiffs, the testimony of the NASD's general counsel that the organization would have so interpreted them, carries the day for the plaintiffs on the issue whether NASD membership was achievable. Cf. *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

■ The second method of recapture suggested by plaintiffs was through membership in the PBW Exchange by the Adviser or an affiliate. The PBW Constitution states, § 13–2, that:

> Only a corporation whose principal corporate purpose is the transaction of business as a broker or dealer in securities may be registered as a member corporation.

However, the testimony of Elkins Wetherill, president of the PBW Exchange, was unequivocal that an affiliate of the Adviser could have become a member of the PBW Exchange. As such it could have received a substantial portion of commissions as an introducing broker.[23] perhaps as much as 80%, and could have credited these against the advisory fee. At least until the aboli-

tion of reciprocals on July 15, 1973, the member could also obtain PBW Exchange business from NYSE brokers in return for placing orders with them for execution on that exchange. An exhibit showed that on March 5, 1973, PBW had 49 institutional members, including some nine who appear to have been affiliates of advisers or distributors of mutual funds. As indicated, Judge Wyatt did not dispute that an affiliate of the adviser could have become a member of the PBW Exchange until March 15, 1973, but held this would have run counter to public policy.

■ In light of its holding that neither the Adviser nor an affiliate could have become a member of NASD, the district court did not find occasion to discuss the third possibility of recapture suggested by plaintiffs, namely, the recovery of tender offer fees. There seems to be little doubt that once NASD membership was obtained this would have been possible. SEC Exchange Act Release No. 10102, CCH Fed.Sec.L.Rep. ¶ 79,327 (1973), recognized this possibility and reminded fund advisers that where such fees were recovered, they must inure to the benefit of the funds.[24]

## VI. *The Legality of Recapture.*

An *amicus* brief on behalf of Lord, Abbett & Co., investment adviser and principal underwriter for several investment companies, and a defendant in *Papilsky v. Berndt*, (S.D.N.Y. 71 Civ. 2534), tried before Judge Frankel, maintains that even if the recaptures suggested by plaintiffs were attainable, they would have been illegal[25] as in-

---

**23.** Such a member would merely channel the Fund's orders to executing brokers. Thus the Loomis letter, *supra* pp. 13–14, speaking in the context of the abolition of give-ups, notes:

> It should be understood, however, that if mutual fund management does acquire a seat on a regional stock exchange [recapture may be required]. This is particularly likely to be true where the affiliate on the exchange does not execute or clear transactions for the account of the fund, but merely receives revenue from other brokers, which revenue is attributable to transactions executed for the account of the fund by such other brokers.

See also *In the Matter of Provident Management Corp., et al.*, CCH Fed.Sec.L.Rep. ¶ 77,937 n. 10 (1970).

**24.** This release, which says that a fund manager may have "an obligation to name an affiliated broker" to receive such solicitation fees, suggests that the SEC perceived no difficulty in or objection to such an affiliate's becoming a NASD member.

**25.** With respect to tender offer fees, the *amicus* brief contends that the adviser's passing these on to a fund would violate (a) Article III, § 24, of the NASD's Rules of Fair Practice, as held by the district court in *Moses v. Burgin, supra*, 316 F.Supp. at 48, (b) the Williams Amendment to the Securities Exchange Act, § 14(d)(7), and (c) the SEC's rule 10b–13. We disagree. *Amicus* also points to a proposed amendment to 10b–13, published in Securities Exchange Act

fringing the minimum commission and anti-rebate rules of the PBW and Pacific Coast Exchanges.[26]

■ Two preliminary observations are in order. *Amicus* greatly relies on decisions construing substantive provisions in statutes like the Interstate Commerce Act, 49 U.S.C. §§ 2, 10, and the New York Insurance Law §§ 188, 209, 273; but the closest the Securities Exchange Act comes to such a provision is the somewhat back-handed direction in the Maloney Amendment, § 15A(b)(8), that the SEC shall not permit registration of a national securities association unless its rules "are not designed to permit unfair discrimination between customers or issuers." While it is doubtless true, as urged by *amicus*, that exchanges and their members are under a duty to comply with their constitutions and rules filed with the SEC, an exchange has a substantial degree of power to interpret its own rules. Officers of both the PBW and Pacific Coast Exchanges testified that these exchanges did not consider give-ups to affiliates of an investment adviser, discounts (in the case of the Pacific Coast Exchange) or institutional membership (in the case of the PBW Exchange) to constitute violations of their anti-rebate rules.

The second preliminary observation is this: A good deal of the *amicus* brief is devoted to arguing that even if certain methods of recapture were not in fact illegal, counsel could have entertained legitimate doubts of their legality. Such an argument must fail in this case for the reason stated in Part IV of this opinion. If counsel for the Adviser or the Fund entertained doubts as to the legality of various methods of recapture, the *pros* and *cons* could and should have been put to the independent directors, who would then have been able to take legal advice of their own. If, after an independent investigation, they had concluded there was a serious risk of illegality, that might have been an end to the matter. But this did not occur.

■ Approaching the issue of illegality, we start from the fact that none of the arrangements would have resulted in the Fund's paying less than the stipulated commission rates; the alleged "rebate" to the Fund consists in the fact that the Adviser, either directly or by a commensurate reduction in the management fee, would pass on the Fund, in exercise of his fiduciary responsibilities, whatever share the Adviser gained in commissions incurred by its transactions for the Fund. While it is surely true, as argued on behalf of *amicus*, that a

---

Release No. 9920 (1972), which would have made recapture unlawful. The SEC would scarcely have proposed this if recapture was already unlawful. The SEC never adopted the amendment; instead it issued Release No. 10102 discussed in n. 24 *supra*.

**26.** The Constitution of the Pacific Coast Exchange provides:

Commissions shall be charged and collected by members and member firms upon the execution of all orders involving the purchase or sale of securities admitted to dealings on the Exchange for the account of others. Commissions shall be charged and collected pursuant to rules and regulations prescribed by the Board of Governors and shall be at rates not less than those established by said Board. Commissions shall be net and free from any rebate, return, discount or allowance in any shape, manner, method or arrangement direct or indirect.

The Constitution of the PBW Exchange provides:

Sec. 1. Commissions shall be charged and collected upon the execution of all orders for the purchase or sale for the account of members or of nonmembers of the Exchange, of securities admitted to dealing upon the Exchange, except under such Rules as may be adopted by the Board of Governors with respect to special offerings and except as herein further expressly provided; these commissions shall be at rates not less than the rates in this Article prescribed; and they shall be absolutely net and free from any rebate, return, discount, or allowance, in any shape or manner, or by any method or arrangement, direct or indirect.

No bonus or percentage or portion of a commission, whether such commission be at or above the rates herein established, or any portion of a profit, shall be given, paid or allowed, directly or indirectly, or as a salary or as a portion of a salary, to any person or persons for business sought or procured for any member, member firm or member corporation of the Exchange, except as herein expressly permitted.

rebate can arise where a user of services pays the full rate and receives other additional goods or services at less cost than their full value, this principle should not be mechanically transposed to every situation. The reason why executing brokers would have been willing to share commissions with the Adviser was because they were being relieved of the costs entailed in serving smaller customers. Viewed in another way, recapture by a fund was a method, then the only available method, for avoiding the payment of advisory and selling costs exceeding those stipulated in its management contracts. The situation was not one in which recapture would result in an adviser's obtaining services at less than cost whereas others paid the full cost; such unfairness as there was in recapture lay in the fact that advisers to mutual funds were not the only customers who should have benefitted from the size of their orders. Moreover as to this there was evidence that, as stated in PPI, 108–109, "Investment advisers who are also broker-dealers often reduce advisory fees charged nonfund clients by a specified portion of the brokerage commissions generated by their nonfund advisory accounts or otherwise take them into account in setting advisory fee rates for nonfund clients."

Weight should also be given to the views then entertained by the SEC. That body would hardly have suggested that "Under existing commission rate structures, mutual fund shareholders could derive greater benefits from their brokerage commissions if the give-up portions of the commissions were transmitted to the funds themselves or their adviser-underwriters for the purpose of reducing management costs," as it did in PPI, p. 16, if it had thought this arrangement involved an illegal rebate. It would hardly have proposed a rule requiring an adviser not to order or request a give-up unless this was paid over to the investment company or the advisory fees were correspondingly reduced, as it did in Release No. 8239 (1968), if it had conceived that the rule would have mandated illegal conduct.[27] The SEC would not have required Provident Management Corp. and Porteous, its president, to turn over amounts recaptured on the PBW Exchange to the investment company for which they acted, see *In the Matter of Provident Management Corp., et al.*, CCH Fed.Sec.L.Rep. ¶ 77,937 (1970), if the Commission had considered that it would be sanctioning an illegal rebate.[28]

Finally, we have on this point the authority of *Moses v. Burgin, supra,* 445 F.2d at 381–82.[29] With evidence that the respective exchanges would not consider their anti-rebate rules to have been violated by recapture for the benefit of a fund, the court of appeals refused to be impressed by the argument that although such rules concededly would not have been violated by directing give-ups to a broker in reward for services having nothing to do with the particular transaction, a different result would be mandated when give-ups were obtained and applied by the adviser to reduce payments otherwise required from a fund. "We could not think it arbitrary," the court wrote, "in

---

27. Note also the footnote quoted on p. 11 *supra,* indicating that the principles set forth in the proposed Rule 10b–10 "may be equally applicable to other managers of pooled funds who act in a fiduciary capacity and who are able to reduce the portfolio commissions of their beneficiaries."

28. See also the *amicus* memorandum filed in *Gross v. Moses,* 67 Civ. 4186 (S.D.N.Y., 1971), where, as stated in the Report of the Senate Subcommittee on Securities, Committee on Banking, Housing and Urban Affairs, Sen.Doc. No.93–13, 93rd Cong. 1st Sess. p. 84 n. 111 (1973), "the SEC took the position that where recapture of commissions is available through

regional exchange membership, mutual fund management must at least make a bona fide judgment as to whether to establish a brokerage affiliate to recapture commissions for the fund."

29. On the rebate issue, as distinguished from that of the possibility of NASD membership, it can make no difference that *Moses* was concerned with a load fund. Neither does it matter that the illegality discussion in *Moses* concerned only recapture through NASD membership and did not discuss recapture through membership on an exchange; the principles would be the same.

view of the common factors shared by these two kinds of rebates, for an exchange to say that the distinction did not compel a difference in result." For reasons indicated, we find the court's view quite understandable.

Against all this, reliance is placed on the SEC's 1972 statement, p. 742 supra, that institutional "membership and practices which permit the rebate or recapture of commissions, directly or indirectly, should be eliminated." However, the SEC's statements do not explain why a practice which it had urged from 1966 to date had been an illegal rebate. We have been cited to nothing in the committee reports leading to enactment of the Securities Act Amendments of 1975 that would show any Congressional view that recapture under the rigid commission rate structure would have involved illegality. Congress simply decided that in the brave new world of negotiated rates, brokers serving the public should have the benefit of institutional business and that there was no need for institutional membership when the negotiated rate system would allow an institution to have its orders executed at charges that bore a reasonable relation to the services actually rendered.

By stipulating against fixed commission rates, the 1975 amendments eliminated the evil of payments to brokers in excess of the value of their services in executing orders of mutual fund advisers, which had led to give-ups that arguably constituted violations of the spirit of management contracts and caused some advisers to recapture in an effort to achieve for their funds benefits that were properly theirs. Congress' decision that, with this accomplished, institutional exchange membership should be prohibited, implies no view that under the previous commission structure recapture was unlawful. The House committee which considered the 1975 amendments went to the heart of the matter when it said, H.R. Rep.No.94–123, 94th Cong. 1st Sess., p. 57:

The questions of competitive rates and institutional membership, while analytically distinct, are significantly related one to the other.

## VII. *Damages.*

In remanding to the district court for the determination of damages, we are bound to give such guidance as we can.

 The first subject is the appropriate period. In *Moses v. Burgin, supra,* 445 F.2d at 385, the court held that "as a matter of law, in view of the PPI report" liability should attach no later than March 1, 1967, although the district court was left free to conclude in favor of an earlier date—presumably because of the suggestions made in that case by SEC staff as early as June, 1965 and repeated in September, 1966, see 445 F.2d at 377–78, 383. Since our record contains no similar facts (although there is some evidence that the Adviser knew of recapture efforts by other advisers as early as 1965), we hold that liability shall begin on March 1, 1967, thus allowing as did the First Circuit a reasonable period for consideration of and reaction to PPI.[30] Liability for failing to utilize NASD recapture in respect of give-ups shall end on December 5, 1968, when these were abolished, and liability for failing to recapture through membership in the PBW Exchange shall end on March 29, 1973, the effective date of Rule 19b–2. While we see no reason to terminate liability for failing to recapture tender offer fees short of the day of judgment, the district court is free to consider this on the present or a supplemented record.

The amount for which defendants are to be held liable will depend on the attempt, difficult but ineluctable, of seeking to find what would have been. In deciding this we must mediate between the two principles, given expression in cases arising under the antitrust laws, that while "a defendant

---

**30.** This is subject to the caveat that plaintiffs may have failed to present more evidence that would support an earlier date because of the court's ruling in the pretrial order that liability would first be determined. Our opinion should not be read as precluding plaintiffs from endeavoring to develop any such evidence. See *Weiss v. Chalker, supra,* 55 F.R.D. at 170–71.

whose wrongful conduct has rendered difficult ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible," *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927),[31] yet recovery "cannot be had unless it is shown, that, as a result of defendants' acts, damages in some amount susceptible of expression in figures resulted." *Keogh v. Chicago & Northwestern Ry.,* 260 U.S. 156, 165, 43 S.Ct. 47, 50, 67 L.Ed. 183 (1922). The *Moses* court held the defendants (other than unaffiliated directors) liable for Crosby's failure to avail itself of NASD recapture (the only method there being pressed) on all transactions on the PBW and Pacific Coast Exchanges, since any lesser measure of recovery would mean that the business judgment defense, although foreclosed on the issue of liability because of lack of effective disclosure to unaffiliated directors, would be entering through the back door. In a footnote, 445 F.2d at 385, n. 25, the court added that the district court "may well find that at a reasonable interval after a final determination to bank give-ups should have been made," during which interval the unfeasibility of achieving give-ups except on the PBW and Pacific Coast Exchanges might have been ascertained," proper practice would have been, consistent with best execution, to make as many transactions as possible on the two favorable exchanges." [32]

The *Moses* result may appear somewhat harsh, particularly in a case like this involving a medium-sized no-load fund where there were stronger business reasons against seeking recapture, at least for the period when reciprocals or give-ups to brokers in return for sales efforts were in vogue.[33] However, we think the considerations against allowing defendants to attempt to prove that, after independent investigation by the disinterested directors, the board might reasonably have concluded not to recapture, or at least not to go all out for recapture, see Part IV, *supra,* similarly foreclose defendants with respect to damages, as long as damages are limited to the business as actually conducted, namely, to tender fees and to those transactions carried out on the PBW and Pacific Coast Exchanges. On the other hand, if plaintiffs desire to pursue the path, noted in fn. 25 to *Moses,* of urging that the Adviser should have routed more of Fund's business to the PBW and Pacific Coast Exchanges, and of endeavoring to estimate what would have been recapturable if it had, compare *Weiss v. Chalker, supra,* 55 F.R.D. at 171, defendants should be allowed to develop the practical arguments against doing this, although not to relitigate the issues of possibility and legality of recapture. If this should seem a departure from strict logic, it

---

**31.** See also *Story Parchment Paper Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264–65, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

**32.** It is not clear whether the court meant this diversion theory to apply only to the transfer of business from other regional exchanges or of business on NYSE as well. Although the former seems the probable construction, we see no reason why NYSE transactions in securities listed on the PBW or Pacific Coast Exchanges should be excluded from consideration of transfer simply because recapture was known to be unavailable on NYSE.

**33.** It is highly debatable whether an increase in the size of a mutual fund after attaining a certain magnitude is beneficial to the shareholders as distinguished from management. Since large blocks of securities cannot easily be assembled or sold without affecting the market, large funds are often unable to obtain as good a net price over as short a period of time as smaller funds. This restriction not only hampers the performance of a particular security; it also limits the range within which a large fund can choose portfolio securities. See PPI at 251–63. An open end fund like American Investors, however, does need to make sales equivalent to anticipated redemptions in order to avoid having to liquidate portfolio securities at disadvantageous times. For the Fund to have resorted to recapture, and particularly to have sought to maximize this, might have threatened its ability to make such sales in competition with other Funds which rewarded brokers with reciprocals or give-ups, often in addition to a considerable part of a sales load.

would not be the first time this has occurred in the law of damages.

The judgment dismissing the action is reversed and the cause remanded for determination of damages.