**ARTHUR LIPPER CORPORATION and Arthur Lipper, III, Petitioners,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**No. 165, Docket 76–4067.**

United States Court of Appeals, Second Circuit.

Argued Oct. 21, 1976.

Decided Dec. 10, 1976.

Rehearing Denied March 22, 1977.
See 551 F.2d 915.

John A. Dudley, Washington, D. C. (Howard Sanford Klotz, New York City, of counsel), for petitioners.

Stanley Sporkin, Washington, D. C. (Harvey L. Pitt, Gen. Counsel, S. E. C., Paul Gonson, Associate Gen. Counsel, Alan Rosenblat, Asst. Gen. Counsel, Daniel L. Goelzer, Washington, D. C., of counsel), for respondent.

Before FRIENDLY, HAYS and MULLIGAN, Circuit Judges.

FRIENDLY, Circuit Judge:

This petition to review a disciplinary order of the Securities and Exchange Commission (SEC), Securities Exchange Act Release No. 11773 (Oct. 24, 1975), is the latest chapter in the extensive litigation resulting from the financial debacle of IOS, Ltd., S.A. (IOS) and the off-shore funds for which it was investment adviser and distributor. *See Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2 Cir.), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); *IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2 Cir. 1975). We deal here with an order under § 15 of the Securities and Exchange Act, 15 U.S.C. § 78*o*, which revoked the broker-dealer registration of Arthur Lipper Corporation (Lipper Corp.) and barred Arthur Lipper III (Lipper), its principal owner, from association with any broker or dealer. The order, dated October 24, 1975, was predicated on violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the Commission's Rule 10b–5, 17 C.F.R. 240.10b–5, during 1967 and 1968. We confirm the decision that a violation occurred but modify the penalty to suspension for a period of 12 months from the effective date of the SEC's order.

### I. *The Facts, and the Proceedings Before the SEC*

The complaint concerns transactions whereby at the direction of Edward M. Cowett, executive vice-president and director of IOS, Lipper Corp. turned over to IOS's 80%–owned subsidiary Investors

Planning Corporation (IPC), a registered broker-dealer and a member of the National Association of Securities Dealers, Inc. (NASD), a total of $1,450,000, out of the commissions earned by Lipper Corp. on over-the-counter (OTC) transactions for the account of three off-shore funds for which IOS or one of its affiliates was investment adviser. These were Fund of Funds, Ltd. (FOF), a Canadian corporation which invested chiefly in United States mutual funds and also was the sole owner of another investment company, FOF Proprietary Fund, Ltd. (FOF Prop.); International Investment Trust (IIT), organized under the laws of Luxemburg, which invested in companies throughout the world; and Regent Fund Ltd. (Regent), a Canadian investment company with investments in both Canada and the United States. IIT and Regent had no American shareholders; FOF had some 3,000 of a total of over 100,000, although the shares so owned had been acquired without any registration of FOF shares under § 6 of the Securities Act of 1933, 15 U.S.C. § 77f.

IOS had itself been a registered broker-dealer with its principal place of business in Geneva, Switzerland. In 1965, it acquired IPC, based in New York, apparently with a view to building up IPC, which had been operating at a loss, as a vehicle for IOS's American securities business. This plan was shattered and a revamping of IOS' method of doing business was compelled by a SEC order of May 23, 1967, accepting an offer of settlement of a proceeding it had brought on February 3, 1966 against IOS, Bernard Cornfeld (its organizer), Cowett and others. This order provided, so far as here pertinent, that IOS would withdraw its broker-dealer registration; that IOS, FOF, IIT and any investment company affiliated with any of them should conduct no activity subject to the SEC's jurisdiction except as provided in the order; and, save for qualifications not here material, that within 16 months IOS should dispose of its entire interest in IPC. The effect of the

order was to require IOS to devise some method whereby orders for transactions on United States stock exchanges or in the OTC market would have to be placed with exchange or NASD members having offices abroad [1] or with foreign broker-dealers who in turn would refer the orders to American broker-dealers able to execute them. The order also furnished IOS an incentive to build up the value of its equity in IPC in order to increase the price it could obtain upon the required sale.

Anticipating the settlement, Cowett approached Lipper, a partner in the New York Stock Exchange (NYSE) firm of Zuckerman, Smith & Co., to ascertain whether the firm would be interested in opening branch offices in Geneva and London, together with the extensive communications network that would be needed for the purpose of serving as coordinating agent for the flow of IOS brokerage transactions. The other partners in Zuckerman, Smith & Co. declined the proposal although they were willing to have the firm act as clearing agent if Lipper decided to withdraw and form his own company, which would become a registered broker-dealer and member of NYSE and NASD for the purpose desired by IOS. Lipper indicated his interest to Cowett, and proceeded to make the necessary arrangements. His compensation was to be in commissions earned on IOS generated transactions both on and off the exchanges, as to which his company was to be in a favored position.

The Constitution of the New York Stock Exchange required Lipper Corp. to charge the three off-shore funds the fixed commissions then in effect on transactions executed on that exchange and forbade any rebates to them. Until December 5, 1968, NYSE allowed customer-directed give-ups on NYSE transactions to other NYSE members. The record is silent how far IOS directed Lipper Corp. to make such give-ups; in any event the SEC makes no complaint against Lipper Corp. with respect to

---

1. Petitioners assert and the SEC does not dispute that all such offices were operated by members of the New York Stock Exchange.

NYSE transactions. The conduct of which it does complain relates to OTC transactions for the three off-shore funds. As to these also Lipper Corp. charged the commissions provided by the NYSE minimum rate schedule. However, as Lipper anticipated, directions were received from Cowett to give up 50% of these commissions to IPC.[2] Pursuant to these instructions Lipper Corp., during the period from July 10, 1967, to August 5, 1968 remitted to IPC approximately $1,275,000, about 50% of the commissions paid it by FOF Prop., IIT and Regent Fund on OTC transactions.[3] In addition, because cash was required for IPC before September 30, 1968, in order to meet warranties in a subsequently aborted contract for the sale of IPC, Cowett, as president of FOF Prop., by letter dated August 14, 1968, requested that, over and above the "regular" 50% give-up, Lipper Corp. should make additional give-ups to IPC of $175,000 on or before August 30, 1968, and another $175,000 on or before September 30, 1968. Lipper demurred to the size of the request, telling Cowett that no more than an extra $175,000 should be paid. On August 28 Lipper Corp. sent this extra sum, bringing the total give-ups to IPC to some $1,450,-000. The Commission found that neither IOS nor IPC rendered services to the funds in return for these give-ups.

No disclosure of the Lipper Corp.-IPC give-ups was made to the shareholders of FOF (the sole owner of FOF Prop.), of IIT or of Regent Fund. No such disclosure was made directly to the directors of IIT or of Regent Fund. Apparently the most nearly complete disclosure occurred at a meeting of the board of directors of FOF held in Acapulco, Mexico, in April 1968, at which Lipper was present, when Allan F. Conwill, Esq., a director of FOF and counsel for it, IOS, Lipper Corp. and Lipper, informed the FOF directors of the arrangements outlined above; he also advised that Lipper Corp. was in effect required to charge the minimum NYSE commissions for OTC transactions; that there was no legal way for Lipper Corp. to refund any part of such commissions to FOF; that the SEC staff took the position that any give-up on OTC business was a fraud *per se* since there was no fixed rate commission structure on OTC transactions and willingness to give-up a part of the commission showed that the broker would have been willing to take less; but that he considered this position to be unfounded in law. There is no evidence that anyone suggested exploration by outside counsel of the validity of Mr. Conwill's view that Lipper Corp. had to charge the minimum NYSE commission on OTC transactions or that no way could be found whereby the shareholders of FOF would benefit from give-ups to IPC.

Upon these facts and others that will be stated in our discussion, Chief Hearing Examiner, now Administrative Law Judge (ALJ), Blair found on June 11, 1971 that Lipper Corp. and Lipper had willfully violated and willfully aided and abetted violations of § 10(b) of the 1934 Act and Rule 10b–5. Overruling both the assertion of the petitioners that no sanctions should be imposed and the staff's contention that the registration of Lipper Corp. should be cancelled and Lipper should be permanently barred from the securities business, he determined that a suspension of one year

---

2. By letter dated June 29, 1967, Cowett, as president of FOF Prop., directed Lipper Corp. to give up to IPC "the maximum give-up (50%)" on commissions earned on OTC transactions for the account of FOF Prop. On July 11, 1967, as a representative of IIT Management Co., (S.A.), an IOS affiliate, Cowett gave similar written instructions with respect to OTC transactions for the account of IIT. By letter dated March 15, 1968, Cowett, as vice president of Canadian Fund Management Company Limited, also an IOS affiliate, confirmed an earlier request for similar give-ups on OTC transactions effected on behalf of Regent Fund, Ltd.

3. The details were:

| | Gross Commissions | Give-Ups |
|---|---|---|
| FOF Prop. | $1,974,064 | $ 950,821 |
| IIT | 636,423 | 312,175 |
| Regent Fund | 28,670 | 12,521 |
| Total: | $2,639,157 | $1,275,517 |

from the effective date of the order would be the proper sanction as to both. Lipper and Lipper Corp. and the staff filed petitions for review by the Commission, which heard argument on August 28, 1972. By a decision filed on October 24, 1975, the SEC sustained the ALJ's conclusion with respect to violations but directed the drastic remedies of cancellation of Lipper Corp.'s registration and the permanent barring of Lipper from the securities business urged by the staff. Petitioners sought rehearing on the sole basis that three of the four Commissioners who participated in the decision had not been members at the time of argument. The petition for rehearing was denied on January 6, 1976. Securities Exchange Act Release No. 11980. This petition for review followed.

## II. *Liability*

Sections 15(a)(4) and (6) of the Securities Exchange Act authorize the SEC to suspend for a period not exceeding twelve months or to revoke the registration of any broker or dealer or to bar or suspend for a period not exceeding twelve months any person from being associated with a broker or dealer on various grounds. One is willful violation of any provision of the Act or any rule or regulation thereunder; another is willful aiding, abetting, counseling, commanding, inducing or procuring any such violation. The familiar Rule 10b–5 reads as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or

would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

■ There is some initial surprise in seeing Rule 10b–5 invoked where the fraud relates not, as in the usual case, to a particular securities transaction but to a course of dealing in securities regardless of their identity. However, the language of the Rule is broad enough to include the latter type of case and petitioners do not urge that the Rule has no application to a course of dealing where the fraud concerns the overall relation of broker and customer rather than the overvaluation or undervaluation of a security sold or purchased. We see nothing in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), that would militate against application of the Rule in a situation like that here before us, though "the terms 'purchase' and 'sale' are relevant . . . to the question of statutory coverage" even in other than private actions, *SEC v. National Securities, Inc.*, 393 U.S. 453, 467 n.9, 89 S.Ct. 564, 572, 21 L.Ed.2d 668 (1969).

Portions of the Commission's decision seem to take the view, which had been the staff's principal reliance at the hearing and was also stressed in the oral argument of counsel before us, that any give-up of a commission on an OTC transaction is *per se* a "device, scheme, or artifice to defraud." In support of this the Commission points particularly to two passages in its report of December 2, 1966, on the Public Policy Implications of Investment Company Growth (hereafter PPI), H.R.Rep.No.2337, 89th Cong., 2d Sess. These are:

A directed give-up of a portion of the commission charged for handling a transaction for a fund in the over-the-counter market would be a patent waste of investment company assets. Since the over-the-counter market in both listed and unlisted securities is a negotiated market, which is not governed by fixed prices or minimum commission rate schedules, any willingness of the execu-

ting broker or dealer to allow his customer to direct a give-up of a portion of his commission or markup to dealers in fund shares in and of itself shows that a lower price or commission could have been negotiated.

and

In the over-the-counter markets, where brokerage costs are subject to negotiation, give-ups of commissions to brokers who perform no necessary function in connection with a transaction have long been recognized as improper and illegal. Give-up practices have been tolerated in the exchange markets only because brokerage costs are fixed by the exchange minimum commission rate schedules.

*Id.* at 178, 185 (footnote omitted).[4]

█ Insofar as the Commission would attribute legal force to these statements in PPI, we must disagree. While the Report was transmitted to Congress by the Chairman of the Commission pursuant to § 14(b) of the Investment Company Act, it constituted information for the legislature, not a rule having the force of law for the industry, as would a regulation adopted pursuant to 5 U.S.C. § 553. Indeed, we doubt whether these two passages from a 346 page report would qualify even as an "interpretative rule" or a "general statement of policy." In saying this we are quite aware of the importance attached to other portions of PPI in *Moses v. Burgin*, 445 F.2d 369, 383–84 (1 Cir.), *cert. denied*, 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547 (1971), and in *Fogel v. Chestnutt*, 533 F.2d 731, 734–37, 749 (2 Cir. 1975), *cert. denied*, —— U.S. ——, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976). However, those cases cited PPI as placing the mutual fund industry on notice that the SEC believed there were opportunities for

advantaging stockholders that ought to be explored and explained to the disinterested directors, not as having independent legal force. So here we regard the quoted statements from PPI as doing no more than warning the industry what position the Commission would be likely to take with respect to customer-directed give-ups in the OTC market.

We are not persuaded that any such all encompassing across-the-board *per se* principle as stated in PPI would be sustainable in the absence of a Commission rule. It is true that the source of the practice whereby the managers of investment companies directed executing brokers to give up a part of their commissions to other brokers who furnished services in selling investment company shares and in providing research lay in the inordinate profits a few executing brokers would receive under the fixed commission rate structure prevailing on the exchanges. *See Fogel v. Chestnutt, supra,* 533 F.2d at 735–36. We are not certain, however, that even after PPI, if the manager of an investment company determined that the interests of the company would be served by paying fixed commission rates on OTC business, with customer-directed give-ups to brokers who had furnished sales or research service, and disinterested directors, on full disclosure, had joined with others in a good faith determination that this was in the fund's best interest, this would have violated Rule 10b–5. At least we would find it difficult to reach such a conclusion on this record, which contains no evidence that commissions on OTC agency business were in fact the subject of negotiation in 1967 or 1968; rather, as the Commission seemingly concedes in its opinion, a purchaser or seller unwilling to pay the fixed commissions generally charged on OTC

---

4. The Commission relies also on a July 18, 1966 letter from Irving M. Pollack, then Director of the Division of Trading and Markets, to the presidents of the various stock exchanges and of the NASD. One sentence in the three and one-half pages of single spaced text of the letter, which expressed concern about the give-up problem generally, said:

 In this connection, we consider it significant that "give-ups" in the over-the-counter mar-

ket have long been recognized to be improper and illegal.

Apart from the fact that the letter came from a staff member (albeit a high one) rather than from the Commission, we can hardly regard such an incidental statement, for which no explanation was given, as putting the entire industry on sufficient notice of the Commission's views.

business, because of the size of the transaction or for other reasons, would deal with a market-maker as a principal—a course which the 1967 settlement precluded IOS from following unless an American firm with an office outside the United States happened to be a market-maker in the particular issue in which IOS was interested.

■ However, we find it unnecessary to decide whether the extreme position thus far discussed is sustainable. The Commission based its decision primarily on the ground that IOS and its affiliates committed a fraud on the funds by diverting to themselves, through IPC, rebates which belonged to the funds while IPC was doing nothing in return, and that Lipper and his company willfully aided and abetted this. The proposition that it is a fraud on the fund for a manager simply to pocket give-ups which he has diverted to himself is almost too clear for argument. While there has been controversy, illustrated by the *Moses* and *Fogel* decisions, how far an investment adviser was bound to secure give-ups when these were attainable, there has been and could be no question that if these were obtained, they must be applied for the benefit of the fund, either by direct payment or as a reduction in the advisory fees. See statement of then General Counsel Loomis, Securities Exchange Act Release No. 8746 (Nov. 10, 1969); *Provident Management Corp.*, 44 SEC 442, 447 (1970). We recognize that both statements came after cessation of the conduct here complained of, but the proposition needed no elucidation. *See also Moses v. Burgin, supra*, 445 F.2d at 376 n.11. It is no answer for petitioners to contend that they were in no position to police IOS' exercise of its fiduciary responsibilities; they still were under no obligation to engage in conduct aiding IOS' fraud on the funds.

Starting from this position, we shall consider petitioners' various attacks on the Commission's conclusions.

■ (1) Petitioners say that, as a practical matter, they were compelled to apply the NYSE minimum rate commission schedule on OTC transactions. Conceding that Article XV of the NYSE Constitution applied and legally could apply only to transactions on that exchange, they contend that NYSE looked with suspicion on the charging of lower rates on OTC transactions since such rates, at least if below cost, might operate in practical effect as a rebate of a portion of the commissions charged the same customer on NYSE business. They point to evidence that in fact NYSE would require a member that charged less than NYSE minimum commissions on OTC business to provide cost justification and contend that, as a new member operating a complex and costly trans-Atlantic communications network, it could not have satisfied NYSE that lower commissions on IOS generated OTC transactions were cost justified.

We need not debate the solidity of the factual basis for the argument. Whatever force petitioners' contention might or might not have if Lipper Corp. had retained the full commissions on OTC business and the complaint was that this amounted to a gouging of the funds, this was not what occurred. In fact Lipper Corp. did just what it claims NYSE prevented it from doing, namely, conduct OTC business at less than NYSE commission rates. Give-ups to the manager of an investment company on OTC transactions infringed the NYSE policy that members should not compete for business on a price basis as much—or as little—as the charging of lower commissions or give-ups to the investment company itself would have done. As the Commission said:

> The Lipper respondents claim to have been in fear of disciplinary action by the New York Stock Exchange. But they have never explained why this fear did not restrain them from giving up to IPC. If the New York Stock Exchange's rules had been applicable to these transactions, they would have prohibited commission-splitting with IPC as well as with the funds that paid those commissions.

Putting the matter in another way, petitioners' conduct either violated the spirit of the NYSE Constitution or it did not. If it did, they can derive no comfort from the

argument that their acts were compelled by the NYSE Constitution; if it did not, they likewise gain no protection.

In any event, no NYSE practice could immunize conduct assisting investment company managers effectively to pocket give-ups when the funds receive nothing in return.

■ (2) Petitioners argue that even though their conduct might have violated Rule 10b–5 if the three funds had been registered investment companies, a different conclusion is compelled because here the payment of give-ups to the manager was at the expense of off-shore funds, only one of which had American shareholders. The argument ignores that the fraud charged by the SEC was perpetrated in the United States by payments from one registered broker-dealer (Lipper Corp.) to another (IPC) in connection with the purchase and sale of securities in the United States over-the-counter market. We said in *IIT v. Vencap, Ltd., supra,* 519 F.2d at 1017:

> We do not think Congress intended to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners.

Petitioners thus derive no support from so much of the decision in *Bersch v. Drexel Firestone, Inc., supra,* 519 F.2d at 992, as held that merely preparatory activity or non-feasance in the United States was not sufficient to trigger application of the securities laws in a class action for damages in the absence of effect on Americans. Also, in light of its language and our previous decisions, notably *Schoenbaum v. Firstbrook,* 405 F.2d 200, 207–08 (2 Cir. 1968), *modified in other respects,* 405 F.2d 215 (*en banc*), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), no discussion is needed to demonstrate the inapplicability of § 30(b) of the Securities Exchange Act, 15 U.S.C. § 78dd(b), which exempts "any person insofar as he transacts a business in securities without the jurisdiction of the United States." Petitioners argue that characterizing the transaction as a fraud on the funds may displace otherwise applicable foreign law, since certain countries in which IOS and its affiliates operate would allow the manager of an investment company to receive a commission for placing an order, in addition to the commission payable to the broker executing it. We do not think the result should differ on this account. Presumably the receipt of such commissions would have had to be reported by IOS and would thus have been known to existing shareholders of the funds and to persons solicited to buy their shares. Here IOS, through IPC, secretly pocketed the money. Moreover, we see no reason why the United States may not prescribe a rule for conduct within its borders even if another country having an interest might be less rigorous. *See Bersch v. Drexel Firestone, Inc., supra,* 519 F.2d at 985; Restatement of the Foreign Relations Law of the United States § 17 (1965).

■ (3) Little need be said in regard to petitioners' contention that the arrangements for the payment of rebates to IPC were adequately disclosed. Admittedly no disclosure was made directly to the boards of directors of IIT and Regent; the disclosure to the board of FOF was only that the arrangements were proper, with no attempt by independent directors to check this. Petitioners contend they could not compel disclosure; perhaps not, but here again they were under no obligation to engage in conduct that would be fraudulent without it. Moreover, it is not within the competence of a board of directors of an investment company to sanction the perpetration of a fraud by the manager. *Cf. Schoenbaum v. Firstbrook, supra,* 405 F.2d at 219–20; *Drachman v. Harvey,* 453 F.2d 722, 736–38 (2 Cir. 1972) (*en banc*). Indeed, it would seem that only a unanimous shareholder vote could ratify a fraud of this type even if approved by directors. See Ballantine on Corporations § 71, at 177 (rev. ed. 1946); Cary, Cases and Materials on Corporations 591–92 (1969); Lattin, Jennings & Buxbaum, Corporations 821 (1968 ed.); *Keenan v. Eshelman,* 23 Del.Ch. 234, 2 A.2d 904 (Sup.Ct.1938); *Continental Securities Co. v. Belmont,* 206 N.Y. 7, 99 N.E. 138 (1912).

An arrangement like that here at issue, which was a bald diversion to the manager of sums belonging to the investment company, is quite different from the situation in *Moses v. Burgin* and *Fogel v. Chestnutt*, where there were some arguable reasons against seeking recapture so that a negative decision by the board of directors, after full disclosure to the independent directors and approval by them and their colleagues, might protect an adviser from liability, under the business judgment rule. *See Fogel v. Chestnutt, supra*, 533 F.2d at 750.

(4) We find it convenient to treat together petitioners' arguments on the scores of scienter, willfulness and reliance on the advice of counsel.

It would seem at first blush that since the relevant provisions of § 15 of the Securities Exchange Act require a showing of willful violation or willful aiding and abetting, little would have been added by the recent holding in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), that "scienter" is a necessary element to establish liability in an action for damages under Rule 10b–5. However, "the Commission has consistently held under § 15(b) that the term ["willfully" in § 15] does not require proof of evil motive, or intent to violate the law, or knowledge that the law was being violated. . . . All that is required is proof that the broker-dealer acted intentionally in the sense that he was aware of what he was doing." 2 Loss, Securities Regulation 1309 (1961). This view has been accorded judicial acceptance. As this court said in *Tager v. SEC*, 344 F.2d 5, 8 (2 Cir. 1965):

It has been uniformly held that "willfully" in this context means intentionally committing the act which constitutes the violation. There is no requirement that

the actor also be aware that he is violating one of the Rules or Acts.[5]

Petitioners are thus right in contending that it is important to determine what standard of culpability *Hochfelder* imposes for a violation of Rule 10b–5 such as that here alleged, and specifically what the proper standard is in a disciplinary proceeding.

The *Hochfelder* plaintiffs sought to hold Ernst & Ernst, an international accounting firm, liable as an aider or abettor of one Leston B. Nay, president of First Securities Company of Chicago, a small broker. Nay had induced the plaintiffs to invest in allegedly high-paying "escrow accounts" which he immediately converted to his own use. The accounts did not appear in First Securities' books and records, payment having been made by personal checks payable to Nay or to a designated bank for his account. In urging that Ernst & Ernst was liable as an aider and abettor, plaintiffs "specifically disclaimed the existence of fraud or intentional misconduct," 425 U.S. at 190, 96 S.Ct. at 1380. The claim was that Nay had imposed a "mail rule" that no mail addressed to him or to First Securities to his attention could be opened by anyone other than Nay, even if it arrived in his absence; that if Ernst & Ernst had conducted a proper audit, they would have discovered the existence of this rule; that Ernst & Ernst should then have disclosed the rule, in reports to the SEC, as an irregular procedure that prevented an effective audit; and that this would have led the SEC to make an investigation of Nay that would have revealed his fraudulent scheme. The Supreme Court held that a mere claim of negligence did not suffice to support an action for damages under Rule 10b–5 but that "scienter" must be alleged and proved.[6] Since plaintiffs had claimed noth-

---

5. The court cited, in addition to the Loss treatise, *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 468 (2 Cir.), *cert. denied*, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959), and *Hughes v. SEC*, 85 U.S.App.D.C. 56, 174 F.2d 969, 977 (1949).

6. The Court left open "the question whether scienter is a necessary element in an action for injunctive relief under § 10(b) and Rule 10b–5." 425 U.S. at 194 n.12, 96 S.Ct. at 1381. The

Court said nothing about whether scienter is a necessary element in disciplinary actions under § 15. These actions share with damage suits the quality of visiting serious consequences on past conduct, even though they also have a remedial effect. They thus differ from injunctive proceedings, the objective of which is solely to prevent threatened future harm, although

ing more than negligence, the Court had no occasion to refine its definition of *scienter* beyond saying that the term "refers to a mental state embracing intent to deceive, manipulate, or defraud" and leaving open the question whether reckless behavior would suffice to meet that test, 425 U.S. at 194 fn. 12, 96 S.Ct. at 1381.

Putting aside for the moment the defense of reliance on the advice of counsel, we do not regard the *Hochfelder* decision as carrying the day for petitioners. The Court held that in order to create liability for damages under Rule 10b–5—and we assume in petitioners' favor that the same standard governs proceedings under § 15, *see* fn. 6—there must be proof of intention "to deceive, manipulate, or defraud"—not an intention to do this in knowing violation of the law. The Court reasoned that the language of § 10 suggested that the section "was intended to proscribe knowing or intentional misconduct," 425 U.S. at 197, 96 S.Ct. at 1383.[7] It thought that use of such words as "manipulative," "device," and "contrivance" made "unmistakable a congressional intent to proscribe a type of conduct quite different from negligence," 425 U.S. at 199, 96 S.Ct. at 1384. And it referred, 425 U.S. at 202, 96 S.Ct. at 1385 to the oft-cited testimony of a sponsor of the

Act before the House Committee on Interstate and Foreign Commerce that what became § 10(b) says "Thou shall not devise any other cunning devices." While that phrase could not be regarded as including negligence, it reads precisely on what petitioners did here—charging the full NYSE commission rates on IOS generated OTC transactions and rebating half of these to IPC, a subsidiary of IOS, knowing that IPC would retain the sums paid to it although these should have been turned over to the funds directly or applied to reduce the advisory fee. It is no answer that petitioners may not have realized that this "cunning device" was a fraud.

We likewise reject petitioners' argument that there was no violation of Rule 10b–5 because they acted on the advice of their counsel, Mr. Conwill. We are not required to consider the Commission's arguments that the conduct was so flagrant a fraud that advice of counsel could never be a defense or that such advice must be disregarded because Mr. Conwill informed petitioners that his advice ran counter to a position as to the illegality of give-ups on OTC transactions taken by the Commission's staff and indeed by the Commission in PPI. It is a sufficient answer that, with all respect for Mr. Conwill's knowledge and

unlawful conduct is necessary—if not always sufficient—to demonstrate the reality of this threat. We therefore assume, *arguendo*, without deciding, that the *Hochfelder* culpability standard applies in disciplinary proceedings. Cf. Jaffe, Judicial Control of Administrative Action 267–68 (1965) ("Revocation, indeed, seems often to be used as a sanction not so much to control the respondent as to warn others, and thus it has a significant 'penal' component, even though the courts may choose to mask its character by calling it a 'civil' remedy.") (footnote omitted).

7. Indeed, even in the criminal context neither knowledge of the law violated nor the intention to act in violation of the law is generally necessary for conviction. The first proposition seems implied by the rule *ignorantia juris non excusat*. Hall, Criminal Law 288 (2d ed. 1961). And the second, of course, follows from the first. Perkins, Criminal Law 745 (2d ed. 1969). See ALI, Model Penal Code §§ 1.13(12), 2.02(2)(a) & (b); *Ellis v. United States,* 206 U.S. 246, 257, 27 S.Ct. 600, 602, 51 L.Ed. 1047 (1907), where, in rejecting a claim that knowl-

edge of the law was required for conviction under a statute that included the word "intentionally", Justice Holmes said, "If a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent." And see *Tager v. SEC, supra,* 344 F.2d at 8:

We have recently held that a finding of actual knowledge is not necessary for finding criminal liability under § 24 of the Securities Act, 15 U.S.C. § 77x, for "willful" violations of §§ 5(a) and (c) and 17(a), 15 U.S.C. §§ 77e(a), (e), and 77q(a). *United States v. Benjamin,* 328 F.2d 854, 863 (2 Cir.), cert. denied, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed. 497 (1964). As Professor Loss reminds us, "It is conceivable, therefore, that 'willfully' means something less in § 15(b) than it does in the penal provisions of the SEC acts." 2 Loss, [Securities Regulation] 1309. It is inconceivable that it means something more.

experience, he was not in a position to give petitioners wholly disinterested advice and petitioners could not have reasonably have thought he was. Although Cowett of IOS apparently was the architect of the plan here attacked, Conwill was counsel for IOS and his primary concern lay, as petitioners must have known, in promoting its interests by assisting Cowett. Petitioners say it was natural for them to turn to him, since he was so familiar with IOS' settlement with the SEC. But this familiarity could have been at the disposal of independent counsel retained by petitioners; alternatively petitioners could have retained Mr. Conwill and then had independent outside counsel check his advice. Petitioners also note that, in addition to being counsel for IOS, Conwill was a director of FOF so that they were justified in believing that he was giving proper heed to the interests of the funds. We cannot regard the wearing of this additional hat as relieving Conwill of the interest he had as IOS' counsel in giving his sanction to an arrangement so advantageous to it. Petitioners' reliance on his advice goes not to the violation, but to the penalty.

(5) The points that initially gave us most concern were petitioners' claims that many other NYSE firms, including some of high reputation, made give-ups or conferred other benefits on IPC in connection with OTC transactions initiated by IOS and that the only other firms disciplined in connection with IPC's receipt of give-ups, Hertz, Warner & Co. and Dishy, Easton & Co., together with certain principals, were only suspended from certain activities for short periods pursuant to settlement offers. Securities Exchange Act Releases No. 8874 and No. 8702. Petitioners' argument is not simply a

protest against selective enforcement. They claim that the prevalence of the practice of customer-directed give-ups on OTC transactions weighs heavily against the SEC's contention that it was a violation of law.

 Examination of the record indicates that both the selective enforcement claim, to which in any event *Oyler v. Boles,* 368 U.S. 448, 454–57 (1962), would be a formidable obstacle, and the prevailing practice argument are considerably overstated. The record does demonstrate that other firms gave up to IPC in connection with OTC transactions. However, the exhibits prepared from IPC's books showing the corporation's receipt of reciprocal and directed income were not confined to OTC give-ups, and it seems indisputable that the activity of Lipper Corp. in this regard was far greater than that of these other firms. More important, in the view we take of the case, namely, that the SEC was not obligated to predicate liability on the broad basis that any OTC give-up was a *per se* fraud but could and did rely on the fact that petitioners made give-ups to IPC, knowing that this was an 80%-owned subsidiary of IOS and that no sales or research service was furnished in return, the evidence is much less significant. For nothing in the record shows that the other brokers who made OTC give-ups or conferred other benefits on IPC were aware of the latter facts. The evidence thus does not establish widespread belief in the legality of what petitioners did—for whatever bearing that might or might not have. The effect of the evidence of widespread give-ups and other benefits to IPC on OTC business, like the advice of counsel defense, goes rather to the penalty.[8]

---

8. Petitioners raise the point, made in their unsuccessful petition to the SEC for rehearing, that they were denied due process because although three of the four commissioners then in office heard oral argument on August 28, 1972, only one of these, Commissioner Loomis, joined in the decision of October 1975—the other three participants in the decision not having been members of the Commission in August 1972; petitioners, however, do not urge that we remand for additional oral argument because of this. Rule 21(f) of the Commission's Rules of Practice, 17 C.F.R. 201.21(f), allows a member who was not present at oral argument to participate in the decision on condition that he review the transcript of the argument, and it is not contended that this was not done. There is no general constitutional right to oral argument before an administrative agency, *FCC v. WJR,* 337 U.S. 265, 274–77, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949), and the Commission's rule represents a reasonable accom-

## IV. *The Penalty*

As stated, the ALJ rejected the staff's recommendation that Lipper Corp.'s certificate of registration should be cancelled and that Lipper should be barred and instead proposed a 12 month suspension, a period which expired in late October, 1976. The Commission adopted the staff recommendation.

*Wright v. SEC*, 112 F.2d 89 (2 Cir. 1940), might appear to be an obstacle to our altering the penalty chosen by the Commission. In *Wright*, review was sought of an SEC order expelling the petitioner from several national security exchanges and the court held that only one of the two findings of violation was justified. Still, a majority of the panel apparently thought that a reviewing court was "without power to supervise" the Commission's choice of sanction, although Judge Swan, the author of the opinion, disagreed:

> The petitioner urges that the order of expulsion is unduly harsh; that an order of suspension would have accorded investors all the protection they need. So far as appears this was Wright's first infraction of the statute. For many years he has been operating in Wall Street and his transactions in Kinner stock are the only blemish upon his reputation. There is nothing to indicate that he is an habitual manipulator or would be likely to try to manipulate the market in the future. To deprive him for all time of an opportunity to pursue his calling in a lawful manner

does seem severe. But a majority of the court hold the view that we are without power to supervise the Commission's discretionary determination that expulsion of the petitioner is necessary and appropriate for the protection of investors. The writer of this opinion does not share that view, believing that under the power conferred upon this court to "modify", as well as to affirm or to set aside an order in whole or in part, we may reduce the relief accorded investors. My own opinion is that the Commission should be directed to reduce it.

112 F.2d at 95–96.[9]

Numerous cases in this circuit since *Wright*, however, while not expressly repudiating that decision, have assumed that Commission-ordered penalties are reviewable as to severity although none apparently considered the sanction under review so harsh as to require that it be set aside. *See, e. g., Berko v. SEC*, 316 F.2d 137, 141–42 (1963); *Tager v. SEC*, 344 F.2d 5, 9 (1965); *Hanly v. SEC*, 415 F.2d 589, 598 (1969); *Fink v. SEC*, 417 F.2d 1058, 1060 (1969); *Gross v. SEC*, 418 F.2d 103, 107 (1969); *Sinclair v. SEC*, 444 F.2d 399, 402 (1971). See also *Boruski v. SEC*, 289 F.2d 738 (1961); *Nassau Securities Service v. SEC*, 348 F.2d 133, 136 (1965).[10] Compare *Jacob Siegel Co. v. FTC*, 327 U.S. 608, 612, 66 S.Ct. 728, 90 L.Ed. 888 (1946). Reviewability of sanctions would seem to be authorized by application of the Administrative Procedure Act, see 5 U.S.C. §§ 551(10) &

---

modation of the interest—one almost essential in these days when many agency members serve so briefly. See *Gearhart & Otis, Inc. v. SEC*, 121 U.S.App.D.C. 186, 348 F.2d 798 (1965).

**9.** The court then remanded to the Commission for its reconsideration of the penalty in view of the holding that one of the alleged violations was insufficiently shown. See 112 F.2d at 96. On remand, the Commission adhered to its determination of expulsion, *In the Matter of Charles C. Wright*, 12 SEC 100 (1942), and this was upheld on further review, *Wright v. SEC*, 134 F.2d 733 (2 Cir. 1943).

**10.** Courts in other circuits similarly have reviewed SEC sanctions on an abuse of discretion or arbitrary or capricious standard. See, e. g.,

*Nees v. SEC*, 414 F.2d 211, 217 (9 Cir. 1969); *O'Leary v. SEC*, 424 F.2d 908, 912 (D.C.Cir. 1970); *Beck v. SEC*, 430 F.2d 673 (6 Cir. 1970) (setting aside four month suspension as a "gross abuse of discretion"); *Quinn & Co. v. SEC*, 452 F.2d 943, 947 (10 Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2059, 32 L.Ed.2d 344 (1972). See also *American Power Co. v. SEC*, 329 U.S. 90, 112–13, 67 S.Ct. 133, 146, 91 L.Ed. 103 (1946), where the Court stated that an SEC remedial action would be set aside "only if the remedy chosen is unwarranted in law or is without justification in fact," a standard more recently applied to the review of an administrative sanction in *Butz v. Glover Livestock Comm'n Co., Inc.*, 411 U.S. 182, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973).

(13), 702, 706, the enactment of which adequately explains why *Wright's* suggestion that an agency's discretionary choice of sanctions cannot be altered has not been followed.[11] See also Jaffe, Judicial Control of Administrative Action 270–71 (1965) ("It is not in accord with current concepts of justice that the exercise of such drastic powers [to revoke or suspend a license] should be totally beyond revision, particularly where exercised by our monolithic, policy-oriented agencies."); Schwartz & Wade, Legal Control of Government 270 (1972) ("One of the limitations of the administrative expert is his tendency to single-mindedness and excessive zeal. The judges can stand apart from the tensions of the immediate case and mitigate the enthusiasm of the expert by the community's sense of justice."). Given our power to review SEC penalty determinations, our auhority to limit such sanctions in appropriate cases seems necessarily to follow.

 Coming then to the question of the appropriateness of the Commission's sanction, we think it was too severe.[12] Clearly it is unnecessary to prevent petitioners from again doing what they did, since all customer-directed give-ups have been abolished since December 5, 1968. The purpose of such severe sanctions must be to demonstrate not only to petitioners but to others that the Commission will deal harshly with egregious cases. Viewed in bald outline and in the light of hindsight, petitioners' conduct may indeed seem egregious. But, as conceded by the Commission in an *amicus* brief filed in this court in *Tannenbaum v. Zeller*, No. 75–7503, the years 1967 and 1968 in which petitioners engaged in unlawful give-ups were years of considerable uncertainty as to the regulatory climate concerning give-ups; the Commission was torn between its desire to move away from uni-form fixed commission rates, a movement which would eliminate the economic basis for customer-directed give-ups, and its belief that existing give-up opportunities should be utilized by investment advisers for the benefit of shareholders in mutual funds. True, there was nothing in all this that should have induced a belief that give-ups could be utilized for the benefit of the adviser rather than of the fund. Still petitioners were living in a world of customer-directed give-ups, which many other competing brokers were directing to IPC. Moreover, they did act under the supervision of experienced although in our view not disinterested counsel and, while they knew exactly what they were doing, there is no evidence that they had any thought they were violating the law—unless, of course, it were the law that any give-up on OTC business was fraudulent, which they had been advised, perhaps correctly, was not true. We are moved also by the inordinately long time in which this proceeding has been pending, particularly the unexplained lapse of over three years from the argument to the decision of the Commission, the cloud that has hung over petitioners' heads during this period and the tremendous disparity between the sanctions invoked against petitioners and that imposed on two other brokers whose violations were perhaps more clear. Finally, although the Commission is in no way bound by the views of the ALJ, *FCC v. Allentown Broadcasting Corp.*, 349 U.S. 358, 75 S.Ct. 855, 99 L.Ed. 1147 (1955); *Hiller v. SEC*, 429 F.2d 856, 858 (2 Cir. 1970), some weight may properly be given to his opportunity to observe Lipper and others who played a part in the acts here in question and in fashioning a remedy in light of that observation. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 492–97, 71 S.Ct. 456, 95 L.Ed. 456

---

11. Indeed, the Commission does not contend here that the order is in any sense unreviewable, urging instead that judicial disturbance of such orders is limited to cases of abuse of discretion. Respondent's Br. at 63.

12. Under the circumstances of this case we give little weight to the Commission's protestations that persons once barred might be read-mitted to the securities business under proper supervision. See *Tager v. SEC*, supra, 344 F.2d at 9. Whatever the force of this in the case of a registered representative, Lipper is hardly interested in returning to the business as a minor salesman in a large brokerage firm. Moreover, eight years have already elapsed since the conduct of which the SEC complains.

(1951). If this statute authorized suspension for a period longer than twelve months, and the Commission had exercised such authority to suspend for say another twelve months, we surely would not interfere. But with the choices limited to a suspension of not more than twelve months or a revocation or bar, we consider that, under the special circumstances of this case, selection of the latter was an abuse of discretion.

The petition to review is therefore denied except that the sanctions shall be limited to suspension of Lipper Corp.'s registration for 12 months from the date of the Commission's order and the barring of Lipper from association with any broker or dealer for the same period.