606 F.2d 5
 56 A.L.R.Fed. 278, Fed. Sec. L. Rep. P 96,947
 CA 79-3030 FIDENAS AG, Sidesco International Ltd., and Mr.
G. P. Jurick, Plaintiffs-Appellants,
v.
COMPAGNIE INTERNATIONALE POUR L'INFORMATIQUE CII HONEYWELL
BULL S.A.; Compagnie Honeywell Bull S.A., Honeywell Bull
(Schweiz) A.G., Honeywell Information Services A.G.,
Honeywell AG, Bull Holding S.A., Josef Grandi and Maxime
Bonnet, Defendants-Appellees.
 Nos. 784, 785, Dockets 78-7458, 79-7055.
 United States Court of Appeals,
Second Circuit.
 Argued April 30, 1979.
Decided Aug. 6, 1979.
 
 James C. Sargent, New York City (David G. Taylor, Gary P. Rosenthal, Whitman & Ransom, New York City, of counsel), for plaintiffs-appellants.
 David S. Patterson, New York City (Donald B. da Parma, Alan C. Drewsen, Breed, Abbott & Morgan, New York City, of counsel), for defendants-appellees.
 Before GURFEIN and MESKILL, Circuit Judges, and WYZANSKI,* District Judge.
 MESKILL, Circuit Judge:
 
 
 1
 This is an appeal from a judgment entered in the United States District Court for the Southern District of New York, Marvin E. Frankel, Judge, dismissing a complaint brought primarily under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5. The district court determined both that it lacked subject matter jurisdiction and that the plaintiffs lacked standing to pursue their claims under the statute, each determination being sufficient and independent reason for ordering dismissal. The court also determined that it lacked in personam jurisdiction over all but two of the defendants, and that the forum non conveniens argument put forth by the defendants was "persuasive." After the district court had entered its order, and after a notice of appeal had been filed, appellants moved for relief pursuant to Fed.R.Civ.P. 60(b)(2). The district court, per Milton Pollack, Judge, determined that the allegedly new evidence tendered by the plaintiffs "warrant(ed) no change" in Judge Frankel's decision and that, "even if the Court were disposed to grant the motion, it would not have jurisdiction to do so unless the case were remanded by the Court of Appeals." Appellants ask us to reverse Judge Frankel's decision and to review Judge Pollack's order. We decline to do either, basing our decision on the "fundamentally preliminary" defect in the appellants' case lack of subject matter jurisdiction.[1] Leroy v. Great Western United Corp., --- U.S. ----, ----, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979).
 
 
 2
 The plaintiffs in this action are a Swiss company by the name of Fidenas AG, a Bahamian company by the name of Sidesco International Ltd., and a German citizen residing in Switzerland by the name of G. P. Jurick. Jurick is described as the "managing executive" of Fidenas and Sidesco. It appears that he and his family own all of the Fidenas and Sidesco stock. On this appeal, the plaintiffs describe themselves as "international dealers in commercial paper and financial advisers" and as being "engaged in the business of financing and arranging financing for companies." The central defendant is a Swiss computer sales company operating exclusively in Switzerland under the name of Honeywell Bull (Schweiz) A.G., hereafter referred to as "HBS." Also sued is Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A., referred to as "CII-HB," and Compagnie Honeywell Bull S.A., referred to as "CHB." CII-HB is a French company, partly owned by Honeywell Information Systems, Inc., and engaged in the production and sale of computers and peripheral equipment; CII-HB is HBS's current "parent." CHB, also a French company and also partly owned by Honeywell Information Systems, Inc., preceded and eventually merged into CII-HB; CHB was HBS's "parent" at the time of the transactions that gave rise to this suit. In addition, the plaintiffs named as defendants (1) Honeywell Information Services AG, a Swiss company owned by a French company which in turn is owned partly by Honeywell Information Services, Inc., engaged in the sale of computer time sharing services; (2) Honeywell AG, a Swiss subsidiary of Honeywell, Inc., located in Minneapolis, Minnesota, engaged in the sale of controls for commercial and residential customers; and (3) Bull Holding S.A., a Swiss subsidiary of CII-HB existing solely as a holding company. Finally, the plaintiffs named as defendants two individuals by the names of Josef Grandi, a Swiss citizen and resident working as managing director of HBS, and Maxime Bonnet, a French citizen and resident working as a marketing executive for CII-HB.
 
 
 3
 According to the plaintiffs, "(t)his case involves a multi-national fraud and conspiracy of world-wide proportions involving events and parties in at least six countries the United States, Canada, France, Switzerland, Liechtenstein and the Bahamas." The facts asserted to support this characterization are as follows.[2] In late 1972, Jurick was introduced to Roland Staempfli, then working as HBS's chief financial officer. As a result of this meeting, Fidenas arranged a financing for HBS in the amount of DM 3,500,000 through the issuance of one-year promissory notes. Sidesco purchased the first four of these notes in December of 1972 and immediately sold them to Bishops Bank and Trust Co., Ltd., the predecessor of the Bishops International Bank Ltd., which in turn is an affiliate of the National Westminster Bank and the Royal Bank of Canada, located in Nassau, Bahamas. Almost a year later, another note financing took place. This note, for DM 4,000,000, was apparently intended to provide funds to cover the original notes, was not to mature until July of 1975 and was placed by the plaintiffs directly with Bishops Bank. The plaintiffs also entered into an underwriting agreement which lasted between late 1973 and early 1975, pursuant to which the plaintiffs sold HBS notes to various of its customers, including the Merban Corporation in New York City. These notes were in turn sold by Merban to other financial institutions.
 
 
 4
 As it turns out, the HBS notes were fraudulent, having been prepared and forged by Staempfli. The proceeds of these notes were apparently invested by Staempfli in speculative ventures through a Canadian company called Chemalloy Minerals Ltd., a firm which was hoping to develop natural gas fields in Texas. Chemalloy went bankrupt, however, and virtually all of the proceeds of the notes were lost. On February 7, 1979, Staempfli was convicted of criminal fraud and was sentenced by the Zurich Court to four and one-half years in prison. In the meantime, the fraud having been discovered and announced, and various of the HBS notes having fallen due, those left holding the notes understandably sought their redemption. HBS, denying responsibility for the fraudulently issued notes, declined to honor them, a decision leading to a number of suits in Switzerland against HBS. None of the purchasers of the unredeemed notes is a party to this action.[3] Also in the meantime, the plaintiffs had lost their principal American customer, Merban Corporation, and, at least in their estimation, began to suffer the consequences of a reputation tarnished by involvement with the HBS notes. Although this summary does not exhaust the factual allegations contained in plaintiffs' complaint, it represents the essential core of those assertions, at least for purposes of this appeal.
 
 
 5
 Judge Frankel treated the matter of subject matter jurisdiction in the following fashion:
 
 
 6
 The transactions involved were "on any view predominantly foreign," . . . . The court concludes that Congress would not "have wished the precious resources of the United States courts . . . to be devoted to" a claim of this nature. . .
 
 
 7
 The complaint contains allegations of fraudulent activity in the United States, but these are totally conclusory, charging only that Honeywell, Inc.'s main office in Minneapolis was acquainted with an alleged cover-up phase of the fraud. These allegations fail to satisfy the requirements of Rule 9(b) as to particularity in alleging the circumstances constituting fraud, or even the ordinary rules of notice pleading. The events on which plaintiffs rely in order to demonstrate fraudulent activity in the United States are secondary or tertiary aspects of the fraud at most. Noteworthy also is the absence of any allegation that these acts were committed by defendants. This void is made critical by plaintiffs' steady use of the passive voice in their complaint, which obscures the identity and locus of various events alleged, and the plaintiffs' failure to challenge the defendants' representation that the acts listed were performed by the Plaintiffs. In any event, even if these acts were performed by defendants, or some of them, within this jurisdiction, they do not alter the conclusion that the transaction was predominantly foreign, and that subject matter jurisdiction is therefore lacking. . . .
 
 
 8
 It is undisputed that all of the parties to this action, both plaintiffs and defendants, are foreign. It is also clear that whatever the scope of the activity within the United States that might emerge from discovery, the essential core of the alleged fraud took place in Switzerland. Any activities in the United States were clearly secondary and ancillary. Such relatively minor activity in the United States does not alter the conclusion that subject matter jurisdiction is lacking, particularly when, as is charged here, it primarily takes the form of culpable nonfeasance. . . .
 
 
 9
 Plaintiffs' reliance on the fact that some of the notes issued by HBS were ultimately acquired by American purchasers is entitled to little weight in the setting of this case, unlike a class or derivative action where the group represented includes American "victims" or an SEC enforcement proceeding. Here the critical consideration is that the plaintiffs, the defendants, and the transaction are foreign.
 
 
 10
 We believe that the district court was entirely correct on this point.[4]
 
 
 11
 The 1934 Act offers little assistance regarding subject matter jurisdiction. Section 27 grants exclusive jurisdiction to district courts over all actions "brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder." 15 U.S.C. § 78aa. And the only provision which deals specifically with extraterritorial jurisdiction is § 30(b), which provides:
 
 
 12
 The provisions of this chapter or of any rule or regulation thereunder shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States, unless he transacts such business in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate to prevent the evasion of this chapter.
 
 
 13
 15 U.S.C. § 78dd(b). No rules have been promulgated by the SEC under § 30(b). Compare ALI Federal Securities Code Proposed Official Draft § 1905 (March 15, 1978). See also R. Karmel, The Extraterritorial Application of the Federal Securities Code, 7 Conn.L.Rev. 669 (1975); J. Curtis, The Extraterritorial Application of the Federal Securities Code: A Further Analysis, 9 Conn.L.Rev. 67 (1976).
 
 
 14
 Lacking statutory guidance, this Court has on a number of occasions set about the task of outlining the general contours of subject matter jurisdiction under the federal securities statutes. For example, in Schoenbaum v. Firstbrook, 405 F.2d 200, 206 (2d Cir.), Aff'd in relevant part, 405 F.2d 215, 217 (2d Cir. 1968) (en banc), Cert. denied, 395 U.S. 906, 85 S.Ct. 1747, 23 L.Ed.2d 219 (1969), we observed:
 
 
 15
 Congress intended the Exchange Act to have extraterritorial application in order to protect domestic investors who have purchased foreign securities on American exchanges and to protect the domestic securities market from the effects of improper foreign transactions in American securities.
 
 
 16
 The Court there held that the district court has subject matter jurisdiction "over violations of the Securities Exchange Act although the transactions which are alleged to violate the Act take place outside the United States, at least when the transactions involve stock registered and listed on a national securities exchange, and are detrimental to the interests of American investors." 405 F.2d at 208. In Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326 (2d Cir. 1972), we answered affirmatively the question whether, "if Congress had thought about the point, it would . . . have wished to protect (the) American investor" there involved. 468 F.2d at 1337. We also cautioned, however, that
 
 
 17
 the language of § 10(b) . . . is much too inconclusive to lead us to believe that Congress meant to impose rules governing conduct throughout the world in every instance where an American company bought or sold a security.
 
 
 18
 468 F.2d at 1334. More recently, we have twice considered situations in which foreign plaintiffs attempted to sue American defendants involved in transnational securities transactions. In Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 985 (2d Cir.), Cert. denied, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975), we determined that the question of subject matter jurisdiction in cases such as this one is properly framed as follows:
 
 
 19
 When, as here, a court is confronted with transactions that on any view are predominantly foreign, it must seek to determine whether Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries.
 
 Using this approach, we held:
 
 20
 (T)he anti-fraud provisions of the federal securities laws:
 
 
 21
 (1) Apply to losses from sales of securities to Americans resident in the United States whether or not acts (or culpable failures to act) of material importance occurred in this country; and(2) Apply to losses from sales of securities to Americans resident abroad if, but only if, acts (or culpable failures to act) of material importance in the United States have significantly contributed thereto; but
 
 
 22
 (3) Do not apply to losses from sales of securities to foreigners outside the United States unless acts (or culpable failures to act) within the United States directly caused such losses.
 
 
 23
 519 F.2d at 993. In ITT v. Vencap, Ltd., 519 F.2d 1001 (2d Cir. 1975), decided the same day as Bersch, we considered the issue of subject matter jurisdiction as it related to a foreign plaintiff who had purchased securities connected to the United States. The Court held that the "effects" of the transaction in America were not "substantial" enough to justify subject matter jurisdiction, but allowed for the possibility of such jurisdiction based on certain American conduct under the theory that Congress did not intend "to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners." 519 F.2d at 1017. But again we cautioned that that basis for jurisdiction had but limited application:
 
 
 24
 Our ruling on this basis of jurisdiction is limited to the perpetration of fraudulent acts themselves and does not extend to mere preparatory activities or the failure to prevent fraudulent acts where the bulk of the activity was performed in foreign countries, such as in Bersch. Admittedly the distinction is a fine one. But the position we are taking here itself extends the application of the securities laws to transnational transactions beyond prior decisions and the line has to be drawn somewhere if the securities laws are not to apply in every instance where something has happened in the United States, however large the gap between the something and a consummated fraud and however negligible the effect in the United States or on its citizens.
 
 
 25
 519 F.2d at 1018. See also Arthur Lipper Corp. v. S. E. C., 547 F.2d 171, 179 (2d Cir. 1976), Cert. denied, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978).
 
 
 26
 In our judgment, to state the law governing the question presented by this appeal is to demonstrate that the district court's dismissal of the plaintiffs' complaint was proper. The transactions alleged are "on Any view" transactions that are "predominantly foreign," and we would be no less than astonished were we to learn that "Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to" a case of this nature. Fraud there might have been, and plaintiffs may very well have been damaged by its perpetration. But the dispute here presented is rightfully resolved in the courts of another land. Accordingly, the judgment of the district court is affirmed.[5]
 
 
 
 *
 Honorable Charles E. Wyzanski, Jr., Senior District Judge of the District of Massachusetts, sitting by designation
 
 
 [1]
 We agree with Judge Pollack's view of his jurisdiction to consider the request for Rule 60(b) relief. See Denny v. Barber, 576 F.2d 465, 468 (2d Cir. 1978); Ryan v. United States Lines Co., 303 F.2d 430, 433-34 (2d Cir. 1962). Cf. Benmar Transport & Leasing Corp. v. I. C. C., 582 F.2d 246 (2d Cir. 1978)
 
 
 [2]
 Because the district court disposed of this case on the basis of pleadings and affidavits, our description of the facts is necessarily brief. We do note, however, that given the posture of the case, we have given the plaintiffs "every favorable inference." Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326, 1330 (2d Cir. 1972). Indeed, Judge Frankel himself has, in an earlier case, aptly summarized the law as it relates to the dismissal of complaints on the basis of lack of subject matter jurisdiction at this stage of the proceedings:
 The clearest lesson in the precedents is that the kind of jurisdictional problem we confront here must be decided with close and particular attention to concrete facts. We have been taught "the importance of ascertaining as precisely as possible the exact means by which the alleged fraud has been accomplished, since * * * both the question of jurisdiction and the availability of a remedy may turn upon this." . . . It is necessary "to ascertain exactly what was done by whom, when, and where * * *." . . . We have also been specially instructed in cases of this kind that plaintiffs are "entitled to every favorable inference." . . . In a still developing area, where there may be a need for fine distinctions, live testimony and detailed evidence are likely often to supply the only safe groundwork for deciding "what inferences are most reasonable, as they bear both on subject matter jurisdiction and on the merits * * *." . . .
 The fact that this sector of the law is still in flux adds special force to the requirement of a full factual record. We have not the luxury or the dull chore, according to taste of simply matching the new cases to one or another old paradigm. "(T)he absence of certain of the elements which led to finding subject matter jurisdiction in (earlier) cases does not necessarily preclude a similar conclusion on the different facts presented here." . . . It is necessary even at Nisi prius to fashion rough elaborations of principles still in process of formulation. It may not be enough, for example, to classify specific actions as "merely preparatory" or the "perpetration of fraudulent acts themselves," * * * and then plod from that to a conclusion. . . .
 Sharply divergent accounts of the "facts" or what the facts may turn out to have been are given in the parties' extensive papers. Plaintiffs tender a substantial roster of "acts," by the movants and others, said to bring the case within the jurisdiction of our federal securities laws. (Defendant) gives a quite different factual picture, and makes seemingly cogent attacks upon the materiality of some things in plaintiffs' list. The impulse to track this analysis and deal specifically with these items now is opposed by counsels of judicial prudence. The solid conclusion that emerges is that this is a case that must be tried rather than decided on papers.
 Venture Fund (International) N. V. v. Wilkie Farr & Gallagher, 418 F.Supp. 551, 555 (S.D.N.Y.1976). Here, on the other hand, Judge Frankel determined that "whatever the scope of the activity within the United States that might emerge from discovery, the essential core of the alleged fraud took place in Switzerland. Any activities in the United States were clearly secondary and ancillary." He went on to observe that, "(i)f permitted, discovery might identify some American contacts to indicate a finding of personal jurisdiction as to (CII-HB) and (CHB), but no more. Such stray activities in furtherance of the fraud as might conceivably turn up in the United States could not alter the finding that subject matter jurisdiction is absent." As is indicated in the text, it is our judgment as well that this is one of those rare cases in which the question of subject matter jurisdiction is best decided at the pleading and affidavit stage.
 
 
 [3]
 Connected actions in this country include Fidenas A. G. v. Honeywell, Inc., 77 Civ. 4761 (S.D.N.Y.), and Bishops International Bank Ltd. v. Honeywell, Inc., 77 Civ. 5598 (S.D.N.Y.)
 
 
 [4]
 We need not and do not reach the other bases on which the district court justified dismissal. Nor do we consider whether there might be jurisdiction if an American purchaser of the notes in the United States, like Merban, brought suit in the federal courts
 
 
 [5]
 Because the federal claims were properly dismissed prior to trial, the pendent claims were properly dismissed as well. See Federman v. Empire Fire and Marine Ins. Co., 597 F.2d 798, 808-10 (2d Cir. 1979)